91 A.2d 786 (1952)
KAUFMAN
v.
SHOENBERG et al.
Court of Chancery of Delaware, New Castle.
October 21, 1952.
*788 Stanley L. Kaufman, of Kaufman, Imberman & Taylor, and Joshua Peterfreund, New York City, and William Marvel, of Morford, Bennethum, Marvel & Cooch, Wilmington, for plaintiff.
Albert R. Connelly and Edward C. Perkins, of Cravath, Swaine & Moore, New York City, and Caleb S. Layton and Henry M. Canby, of Richards, Layton & Finger, Wilmington, for defendants.
SEITZ, Chancellor.
I am required to determine the validity of defendant corporation's stock option plan.
Plaintiff, common stockholder, brought this action to enjoin the effectuation of defendant's so-called Restricted Stock Option Plan for Key Employees. Defendant joined issue and this is the decision on final hearing.
A chronological narration of the facts will illume the issues to be resolved.
Defendant[1] was incorporated on January 28, 1924 although its business history goes back to 1908. It is a corporation of institutional size, having about 19,000 stockholders, resources in excess of $1,250,000,000 and annual earnings before taxes of about $63,000,000. It is a holding company which, through its subsidiaries, sells credit service in a highly competitive field. Thus the corporation's success depends upon the ability of some 400 branch offices throughout the United States and Canada to sell such credit service in connection with the financing of such things as automobiles and industrial equipment. The importance of trained and skilled personnel to defendant's success was clearly demonstrated. Such personnel are by nature of their work in constant contact with opportunities in the same and associated fields.
The passage of Sec. 130A of the Internal Revenue Code in September 1950, 26 U.S.C.A. § 130A, materially changed the tax consequences of certain types of stock options. In the spring of 1951, Edwin C. Vogel, a director, former Vice President, and substantial stockholder, suggested to Mr. Dietz, the President, that defendant consider a stock option plan for its key personnel. Dietz ordered two of the officers to make such a study. A study was made of some 59 corporations listed with the New York Stock Exchange which have adopted a plan since the enactment of Sec. 130A of the I.R.C.
On April 26, 1951 the Board authorized the appointment of a committee to consider and report a plan for granting restricted stock options to employees of defendant and its subsidiaries. A committee of four directors, who were not to be eligible to *789 receive options, was appointed by the President. I find as a fact that these gentlemen were qualified through training and experience to discharge their duties properly. I further find that they did so in good faith and that there is no basis whatsoever for any charge of fraud.
On May 24, 1951 the Plan under attack was recommended to the Board. Fifteen of the twenty-four directors were present. Of the fifteen present ten were "interested" in the sense that they were then potential beneficiaries.
The Board voted to approve the Plan subject to the approval of defendant's common stockholders. After the proxy statement was processed by the S.E.C. it was mailed to the stockholders. The proxy statement contained the Plan in full, a statement of its purpose, tax consequences, the intentions of the Committee with respect to its administration, including its intentions as to the amount of options to be issued in the immediate future and the number of recipients of such options.
At a stockholders' meeting held June 26, 1951 the plan hereafter outlined was approved by 97.7% of the shares represented at the meeting and by 78.8% of the outstanding shares. The defendant had about 3,580,000 common shares outstanding of which 2,821,434 were voted for the Plan.
Since the Plan went into effect, options covering 71,456 shares have been granted to 125 employees. Thus on July 2, 1951 options covering 51,150 shares were granted to 36 individuals while on January 29, 1952 options covering 20,300 shares were granted to 89 individuals. These include one for 10,000 shares to Dietz, President, options aggregating 16,250 shares to eight other directors and options aggregating 45,200 to 116 other key employees who were not directors.
The July 1951 options were at $47.75 per share and the January 1952 options were at $53.00 per share, in each case being in excess of 95% of the market price at the granting date. The closing market value for defendant's stock on August 13, 1952 was $69.20 per share.
Language in the proxy sent in connection with the stockholders' meeting emphasizes the incentive nature of the Plan and states that "the Board believes that it will be in the best interests of the Corporation to put into effect a Restricted Stock Option Plan for Key Employees covering a limited number of the authorized but unissued shares of Common Stock of the Corporation".
The principal features of the Plan are:
(i) It provides for the issuance of options, within a 5-year period, for not more than 150,000 shares of unissued Common Stock of the Corporation (about 4.2% of the outstanding stock). Options may be granted only to regular salaried employees of the Corporation and its subsidiaries. Directors who are not such employees, and employees over 65, are not eligible.
(ii) The option price is to be not less than 95% of the fair market value of the stock at the date of granting the options. The price must be paid in full in cash upon exercise of options. The Corporation and its subsidiaries are forbidden to lend money, directly or indirectly, to assist in acquiring or carrying shares issued upon exercise of options.
(iii) An option is non-transferable, and may be exercised during the lifetime of the employee only by him, and only while he remains an employee or within 3 months after termination of employment. In the event of death, it may be exercised by the employee's executor within one year after his death. In no event can an option be exercised after 5 years from the date of granting.
(iv) The employee must agree to remain in the service of the Corporation or one of its subsidiaries for a period of 2 years from the date of granting of the option at the pleasure of the Board and at such compensation as such Board shall reasonably determine from time to time.
(v) The maximum aggregate number of shares as to which options may be granted to any one individual is 10,000.
(vi) The Plan is administered by a Committee, appointed by the Board, consisting *790 of directors who are not eligible to receive options. Subject to the express provisions of the Plan, the Committee has plenary authority to determine the individuals to whom, and the times when options are to be granted and the number of shares to be subject to each option, as well as other terms and provisions of such options. In making such determinations, the Committee is to take into account the services rendered by the respective employees, their present and potential contributions to the Corporation's success and other factors which it deems relevant.
The defendant reported to the Salary Stabilization Board with respect to the grant of the July 1951 options and was advised that such options conformed in all respects with the requirements of the Board's regulations and thus required no special approval.
Plaintiff asserts numerous objections to the Plan. They fall into three categories. First, the directors are charged with bad faith in initiating the plan. Second, it is charged that the Plan was not adequately and fairly disclosed to the stockholders in some nine different respects. Third, it is charged that the Plan and the options issued thereunder do not comply with the Delaware law.

Directors' Alleged Bad Faith in Initiating Plan
Since the Plan was approved by a majority of stockholders who were not, on the record, controlled by the directors, the burden of showing bad faith is on the plaintiff.[2] Let us consider the evidence in this light. The matter was originally suggested by Mr. Vogel, a director who is not eligible to receive any options but who along with his family owns about 65,000 shares. The Plan was studied by a committee of the Board whose members do not benefit. It appears that they considered many plans and exercised a business judgment approach in considering this matter.
I conclude that the actions of the directors and the terms of the Plan do not evidence bad faith on the part of the directors in initiating it. To narrate plaintiff's "evidence" of bad faith would serve no useful purpose because, to give it weight it becomes necessary to string together all sorts of trivia and infuse the whole with a liberal dose of wishful thinking. Plaintiff also charges the directors with negligence and indifference. I find no merit to these charges.

Alleged Omissions and Misrepresentations by Directors
Plaintiff alleges that the interested directors in recommending the Plan to the stockholders withheld information and made false and misleading statements in some nine respects.
It is charged that the failure to advise the stockholders of an existing incentive compensation plan which included most of the future recipients of the options constituted an omission of material information. It is further charged that the omission was deliberate and in bad faith.
The proxy statement does not contain any reference to the incentive compensation plan qua plan but it sets forth "additional compensation" received by the directors. Moreover, the incentive plan, while not approved by the stockholders, was detailed to them in a proxy statement of February 28, 1950  about a year and a half before the vote on the option plan. While it might have been desirable to set forth the terms of the profit sharing plan in the proxy statement, I conclude that the Corporation was not legally bound to do so. Realistically the proxy statement which actually showed "additional compensation" for the directors was an indication or reminder that compensation over and above salaries was being received by directors who would be recipients of the options. The fact that the terms of the profit sharing plan were sent to the stockholders in early 1950 also helps to blunt the charges that the omission was deliberately calculated to mislead. However, it is concededly not dispositive of the matter. Many people might disagree as to what should or should not be in such *791 a statement to the stockholders. Based on my best judgment I conclude that the omission of an explicit reference to the Profit Sharing Plan did not constitute a material omission here.
Plaintiff also points to several other matters of alleged omission or misrepresentation. Some of them are more properly covered under the third general objection and will be there considered. As to the others, I have considered them and I find no merit to any of them.

Plan and Options Issued Allegedly Violate Delaware Law
Plaintiff first contends that the Plan is invalid because it was not approved by a valid quorum of directors. It is alleged that since 8 disinterested directors  8 being defendant's quorum requirement  did not vote for the Plan it is invalid. There is no merit to the plaintiff's contention for two reasons. First, defendant's Certificate of Incorporation provides for the counting of interested directors for quorum purposes. The director action here was for the purpose of submitting the matter for stockholder approval. Such a provision and such action thereunder was approved by this Court in Sterling v. Mayflower Hotel Corp., Del. Ch., 89 A.2d 862, appeal pending. Second our Supreme Court, in considering a stock option plan approved by a board which had to count interested directors in order to make a quorum, concluded that such action could be effectively ratified by the stockholders. Kerbs v. California Eastern Airways, Del., 90 A.2d 652.
Plaintiff next charges that the Plan is invalid for want of consideration. This serious question requires an analysis of the Plan in the light of the recent Delaware Supreme Court decisions.[3]
From the best reading I can give the Kerbs and Gottlieb cases I distill the following pertinent principles:
1. Lacking unanimous stockholder approval, the Corporation must receive legal consideration if a stock option plan is to be valid.
2. The legal consideration may take various forms, such as a covenant to do something for the Corporation.
3. The subject matter of the consideration must have a value reasonably related to the value of the concessions made by the Corporation.
4. Absent independent stockholder ratification, interested directors have the burden of showing that the consideration to be received constitutes a fair exchange for the options. The question as to what if anything may be construed to be "interested director action", other than the cases where their vote is needed for quorum purposes, I believe is still an open one.
5. Where there has been independent stockholder ratification of interested director action, the objecting stockholder has the burden of showing that no person of ordinary sound business judgment would say that the consideration received for the options was a fair exchange for the options granted.
6. The provisions of the Plan or the surrounding facts and circumstances must be such as to reasonably insure that the Corporation will receive the contemplated consideration.
As stated plaintiff contends that the options are not supported by consideration running to the Corporation. Defendant says the consideration comes from the provisions of the Plan and the option agreement which grant the option in return for the following promise of the employee:
"The Employee agrees that he will remain in the service of the Corporation or of a subsidiary corporation for a period of at least two years from the date hereof (or until his earlier retirement), at the pleasure of the Board of Directors of the Corporation or of such subsidiary corporation, and at such compensation as such Board of *792 Directors shall reasonably determine from time to time. This Agreement does not confer upon the Employee any right to continue in the employ of the Corporation or of any such subsidiary corporation, nor does it interfere in any way with the right of the Corporation or of any such subsidiary corporation, or except for said period of two years the right of the Employee, to terminate the employment of the Employee at any time."
I find as a fact that the options were not granted as an inducement to obtain the services of any optionee or to prevent his leaving the Corporation. By this I mean that they did not come to the defendant and are not remaining with it because of any explicit promise concerning stock options. Naturally the existence of such a Plan may well have some such effect but it does not here rise to the point of being a decisive legal factor. There is no legal consideration based on this theory.
Defendant contends most vigorously that the quoted provision of the option agreement whereby the recipient agrees to remain in the employment of the defendant for two years is sufficient consideration for the granting of each of the several options here involved.
Plaintiff argues with equal vigor that the two year employment contract is no real consideration for the options because it is a sham since there was no threat that any optionee would leave the Corporation. But plaintiff says the two year employment provision is invalid in any event because the Corporation only agrees to employ the optionee at its pleasure. Plaintiff insists that such a promise is illusory. Plaintiff also says that the agreement is illusory because the defendant is left to decide the optionee's compensation.
I do not believe the employment provision is rendered illusory because of the provision that defendant's Board shall reasonably determine the optionee's compensation. The Board must act reasonably in fixing the compensation and I think this is a sufficient standard to tender the matter susceptible of objective evaluation and therefore not wholly within the arbitrary power of the Board.
Conceding that the failure of the Corporation to agree to employ the optionee for any period of time, without more, would render the contract invalid, nevertheless, that is not this case because the employment contract also specifically grants the employee an option which is immediately exercisable. I believe this constitutes consideration flowing from the Corporation whether the contract be viewed as bilateral or unilateral. The cross considerations certainly can be different in character so long as they are recognizable as legal consideration.
I conclude that each optionee bound himself, pursuant to the provisions of the Plan to a valid two year employment contract in consideration of the option. At the time he was under no such legal obligation. The remaining question under this aspect of the case is whether such a contract constitutes legal consideration where such optionees have not threatened to leave the defendant's employment. Since the Corporation is admittedly receiving what the law recognizes as legal consideration, viz., a promise to work for two years, which it did not otherwise have, in return for the granting of an option, the present options are supported by legal consideration flowing to the defendant.
Plaintiff insists, however, that under the Plan an optionee could exercise his option in full immediately and then leave the Corporation in breach of his employment contract. This is true, but I do not believe it negatives the conclusion that the employment contract constitutes sufficient legal consideration. See Wyles v. Campbell, D.C., 77 F.Supp. 343. Moreover, if this court were to infer that an employment contract is not legal consideration for the granting of an option, it would be repudiating several cases of that character cited with apparent approval by our Supreme Court in the California Eastern Airways case. It is true that in nearly all, if not all the cases cited, the optionee came with or remained with the Corporation in partial consideration of the granting of the option. *793 However, the possibility of their breaching their employment contracts was equally present.
Plaintiff implies that the employment contract provision is but a subterfuge. She points out there was no personnel problem and that this Plan is described by management itself as an additional "plus" in the way of incentive. I do not believe that an option plan must be reserved for corporations which can show an immediate personnel problem. Indeed, one of the very functions of such a plan is to prevent such a problem arising. I believe the valid employment provisions plus the surrounding circumstances reasonably insure that the Corporation will receive that for which it bargained.
Plaintiff next raises a point of great importance and difficulty. She charges that the Corporation is not receiving a fair return for the options conferred. Where there has been independent stockholder ratification the burden is upon the complaining stockholder to show that no person of ordinary sound business judgment would say that the consideration received for the options was a fair exchange for the options granted. See Gottlieb v. Heyden Chemical Corp., supra. The stockholders necessarily did not ratify the issuance of the specific options here issued except perhaps the option for 10,000 shares to Mr. Dietz, which was mentioned in the proxy statement. However, the proxy statement set forth the mechanics of the Plan including the limitations and standards which should govern the Committee's work. The statement also set forth the prospective committee's personnel and in a general way the recipients of immediate options. The Committee was approved as indicated and none of its members is a beneficiary under the Plan. Under the circumstances I conclude that the rule imposing the burden on the objector continues to apply to the specific action taken by this Committee on each option.
Let us consider whether plaintiff has sustained her burden. It is true that the legal consideration provided by the optionee is his promise to remain in the defendant's employment for at least two years in return for the pay and option. However, this court must recognize the facts of present day corporate life and those facts are inextricably bound up with the federal tax laws. The defendant's proxy statement makes clear to the stockholders the benefit to the employees of certain types of stock option plans. Such options are undoubtedly very attractive. It is not for this court to say that they do not add to job satisfaction and induce added effort on behalf of the recipients with a consequent additional benefit to the Corporation. The long range effect cannot be minimized. These factors are particularly important to the welfare of a corporation such as is here involved.
While such factors, standing alone, were not determined to be legal consideration by our Supreme Court I think there can be no doubt that they constitute the real consideration sought by the Corporation in return for such options. The so-called legal consideration evidenced by a promise to continue in the defendant's employment for at least two years is merely some assurance that the Corporation may receive that which it expects.
In determining the number of shares subject to each option the Committee considered the salary and other compensation of the optionee, as well as the importance of his duties in the over-all management of the Corporation. The Committee also fixed the number of shares with relation to the probable ability of the optionee to exercise the option in full over a five year period.
The Committee did not attribute any dollar and cents value to the options at the time of their issuance, it being their feeling that no such value could be ascertained. The conclusion that restricted stock options of this character cannot fairly be given a dollar and cents value at the date of issuance was supported by the testimony of witnesses in a position to speak with authority on this subject. Moreover, plaintiff's principal witness conceded that no such value could be determined although he felt that the options had what he described as an ultimate liquidable value. He arrived at such value by determining the average high *794 in the market value of the stock for a given number of years and then contrasting that figure with the option price. Under this approach he valued each of the options at a figure of between $18 or $24 per share. I see no merit to this approach in this case.
In any attempt to determine the value of these options it is important to realize that the value  and they admittedly have value  must be viewed from two points of view, i. e., the Corporation's and the optionee's. It is apparent that from the Corporation's position the options here involved might be said to be worth at least the difference between the option price and the market price at the date of issuance because these options could be exercised in full immediately. Therefore, the Corporation could theoretically sell the same shares on the market and obtain as profit the difference between the option price and the market price. However, the testimony was that the Corporation had no need for additional capital and no intention of issuing additional shares.
Yet this theoretical "loss" to the Corporation does not necessarily mean that there is a corresponding benefit to the optionee. I say this because the optionee cannot gain the substantial tax benefit which is at the very heart of the plan unless he holds such stock for at least two years from the option date and six months from the date of exercise. There is no assurance as to what the market situation might be after the lapse of such a period of time. This court must view this plan against the background of the actual position of these optionees within the broad sweep of the legal requirements. I appreciate that the Supreme Court held in the California Eastern Airways case that the provisions of the Internal Revenue Code were too "insecure in nature" [90 A.2d 657] to guarantee that the Corporation would receive the contemplated benefit. However, this does not mean that such provisions are not pertinent to the issue of the "value" of the option. I conclude that they are pertinent. What the Corporation can be said to transfer is an asset which at the time cannot be intelligently valued in dollars and cents from the point of view of either the Corporation or the optionee.[4]
How then shall the Corporation determine the value of these admittedly valuable assets in order to comply with the legal requirement implicit in any value comparison? It appears that the Committee considered and determined that the number of shares made available to each optionee bore, when added to his other compensation, a reasonable relationship to his duties and potential importance to the Corporation. In addition the provisions of the Plan and the future of the company as it was related to its securities were necessarily considered. With so difficult a value problem it is apparent that the court should only "second guess" the corporate determination if it be shocking in the light of the total picture presented.
Considering the available evidence I conclude that plaintiff has not sustained the burden of demonstrating that the considerations exchanged were unfair viewed from the standpoint of a person of ordinary sound business judgment. Obviously and by a fortiori reasoning, there is no evidence of fraud. Plaintiff has failed to show how one can do more in the ordinary case than accept the good faith business judgment of those in a position to know as to the value relationship of the option and compensation  with all the imponderables  to the services to be rendered for them. The court can conceive the situations where relief would be granted if the disparity were so apparent as to come within the Supreme Court rule. Such as, (1) cases where the number of shares made subject to the plan in relation to the total number authorized or issued was shockingly large, or (2) where the spread between market and option price was great, or (3) where there was inside information of an unusual nature concerning the future rapid rise of the stock, or (4) other unusual circumstances. No such showing is made by plaintiff on the present record.
*795 Much of the argument which plaintiff makes is at bottom a disagreement with the whole philosophy of the granting of stock options. In view of our statute I take it that the validity of this practice, when properly invoked, is not a proper subject for judicial inquiry in this State. If the matter of the wisdom of granting options is to be reviewed, it is for the legislature not the court.
One specific option requires further consideration. In July 1951 Mr. Jarvis Cromwell, an officer and director of defendant, was issued options to purchase 2,000 shares of stock. Mr. Cromwell at the time, signed the usual two year employment contract. However, at the time he was already obligated by contract to remain as an employee until December 31, 1951. Plaintiff says that since Mr. Cromwell was already subject to an employment contract the option agreement whereby he signed a two year employment contract did not constitute consideration. I think it clear that the signing of the new agreement which covered a period for one year and a half beyond his existing contract was legal consideration for the granting of the options to Mr. Cromwell. No other aspect of the matter needs to be considered.
Plaintiff attacks the Plan on the ground that all other types of legitimate compensation except this type of option are fully deductible by the Corporation as a business expense. Plaintiff contends that this "abandonment of tax advantages" to the detriment of the stockholders is a violation of the director's fiduciary duty. As in most everything else today, the determination of the directors as to a course of action will probably have tax consequences which will vary with the course pursued. This court can well imagine situations where the relinquishing of some tax advantage either deliberately or negligently might constitute grounds for appropriate relief. However, the tax consequences were set out in the proxy statement sent to the stockholders. Thus I must assume they were an evaluated consideration in connection with the adoption of the Plan. I concur in the conclusion that:
"The tax sacrifice is but an element of compensation and its propriety must be judged in terms of the total compensation paid to the executive and the total cost of such compensation to the corporation."[5]
I conclude that plaintiff has not sustained the burden of demonstrating that the tax loss when considered in combination with the other relevant factors constitutes an actionable wrong.
Plaintiff next contends that no formulated plan was submitted to the stockholders. This charge is premised upon the fact that the Plan may be amended in certain respects. The Plan may be amended but I do not believe the amendments, which must be within certain designated limits, render the Plan invalid because of some alleged insufficiency in formulation. The nature of the Plan demands reasonable flexibility. See also Gottlieb v. Heyden Chemical Corp., supra.
Plaintiff contends that the Plan violates Section 14 of the Delaware Corporation law, Rev.Code 1935, § 2046. In essence, plaintiff suggests that because the Plan authorizes the Committee to select the beneficiaries and the amounts to be issued to them it authorizes a committee to do that which Section 14 only authorizes the Board to do.
Section 14 as far as pertinent provides:
"* * * shares of capital stock without par value * * * may be issued by the corporation from time to time for such consideration as may be fixed from time to time by the Board of Directors thereof, pursuant to authority conferred by the Certificate of Incorporation * * *.
* * * * * *
"* * * every corporation shall have power to create and issue * * rights or options * * * such rights or options to be evidenced by or in such instrument or instruments as shall be approved by the Board of Directors. The terms upon which, the time or times * * * at or within which, and the price or prices at which any *796 such shares may be purchased from the corporation upon the exercise of any such right or option shall be such as shall be fixed and stated in the Certificate of Incorporation * * * or in a resolution or resolutions adopted by the Board of Directors providing for the creation and issue of such rights or options * * * and provided further, that in case the shares of stock so to be issued shall be shares of stock without par value the consideration therefor as to corporations incorporated prior to April 1, 1929, * * * shall be determined in the manner hereinabove provided in this Section for the fixing of the consideration for the issue of such stock."
It is obvious that a special committee of the Board is discharging the obligation imposed upon the Board by the quoted language from Section 14. Plaintiff says that this constitutes an unauthorized delegation by the Board of the duty imposed upon it by Section 14. Defendant contends that the creation of the Committee is fully justified by the following language of Section 9, Rev.Code 1935, § 2041:
"The Board of Directors may, by resolution or resolutions, passed by a majority of the whole board, designate one or more committees, each committee to consist of two or more of the directors of the corporation, which to the extent provided in said resolution or resolutions or in the by-laws of the corporation, shall have and may exercise the powers of the Board of Directors in the management of the business and affairs of the corporation * * *."
The question presented therefore, is whether the quoted language from Section 9 authorizes the creation of a committee which within the limits and on the basis of the standards provided in the Plan may, in place of the full Board, authorize the issuance of the options. Plaintiff says that the quoted language of Section 9 only authorizes such committees to discharge ministerial, current, ordinary and routine powers, citing Fensterer v. Pressure Lighting Company, 85 Misc. 621, 149 N.Y.S. 49. In that case the court held that an executive committee had no power to remove a corporate officer in view of a by-law provision that an officer could be removed by vote of a majority of the whole Board of Trustees; the power vested in them to manage the business not authorizing them to remove officers. The court stated as a general principle that while such a committee was authorized to perform ministerial, current, ordinary and routine powers, it was not impowered to inaugurate radical departures from the fundamental policies and methods for conducting the business as prescribed by the directors.
Assuming that the Fensterer case was properly decided, and further assuming that statutory amendments since that decision have not altered the problem, nevertheless, I feel that Section 9 authorizes the creation of a committee such as is here set up. I say this because the determination of value to be received for stock to be issued is part of the regular powers exercised by a board. While a vitally important function, I believe it is that type of function which is properly within a modern interpretation of the statute.
I therefore, believe that Section 9 and Section 14 must be read together. When so read I conclude that the duties imposed upon this Committee were properly delegated under the authority granted by Section 9.
Plaintiff has raised many other points concerning the Plan. I have considered them and conclude that they are without merit.
I conclude that plaintiff has failed to demonstrate any illegality in connection with the terms of the Plan or the options so far granted thereunder.
Plaintiff's complaint also sets forth an action based upon the fact that the Corporation adopted a resolution providing for certain annual compensation to the members of the stock option committee. Plaintiff's complaint charges that such a resolution violates the Certificate of Incorporation and by-laws of the defendant. Defendant apparently recognizing the merit of the plaintiff's charge passed a resolution *797 rescinding the prior resolution and recaptured all money paid thereunder. The parties talk much about when and if a demand was made upon the Corporation in connection with this matter, and also whether a demand was necessary. I conclude that this charge was of such a character as to require a prior demand upon the Corporation. It does not in my opinion fall within those classes of cases where the circumstances excuse the making of a demand upon the corporation. I say this because the nature of the complaint, plus the evidence, demonstrate that the action came about through a legal oversight.
I further conclude that within a reasonable time after defendant received what I shall assume was a demand in connection with this matter it rescinded its prior action and recovered any money disbursed thereunder. I feel that this is the type of case which forms the very basis for the requirement that the stockholder first make a demand upon the Corporation before bringing any legal action. There is no basis for plaintiff's suggestion that defendant may do the same thing some time in the future.
I conclude that plaintiff is not entitled to relief with respect to the so-called Eleventh cause of action.
Order on notice.
NOTES
[1] Reference to "defendant" will include only the C.I.T. Finance Corp. because, while its directors were also named, they were not served with process.
[2] Gottlieb v. Heyden Chemical Corp., Del., 91 A.2d 57; Kerbs v. California Eastern Airways, Del., 90 A.2d 652.
[3] Kerbs v. California Eastern Airways, Del., 90 A.2d 652, same case, Del., 91 A. 2d 62; Gottlieb v. Heyden Chemical Corp., Del., 90 A.2d 660, same case, Del., 91 A.2d 57. The matter as to which reargument was granted in the Heyden Chemical Case has not yet been decided.
[4] Compare: Compensating The Corporate Executive by Washington and Rothschild (Rev.Ed.) Page 145.
[5] Compensating The Corporate Executive by Washington and Rothschild (Rev.Ed.) Page 167.