Leonard I. SCHREIBER, Plaintiff,

v.

PENNZOIL COMPANY and Pennzoil Offshore Gas Operators, Inc., Defendants.

Court of Chancery of Delaware, New Castle County.

Submitted Dec. 12, 1979.

Decided Sept. 5, 1980.

Irving Morris, Joseph A. Rosenthal and Norman M. Monhait, of Morris & Rosenthal, P. A., Wilmington, and Bennett Frankel and Israel Beckhardt, New York City, for plaintiff.

James M. Tunnell, Jr., of Morris, Nichols, Arsht & Tunnell, Wilmington, and Finis E. Cowan and C. Michael Watson, of Baker & Botts, Houston, Tex., for defendant, Pennzoil Co.

Richard J. Abrams and Charles F. Richards, Jr., of Richards, Layton & Finger, Wilmington, for defendant, Pennzoil Offshore Gas Operators, Inc.

## DECISION AFTER TRIAL FOR DEFENDANTS

HARTNETT, Vice Chancellor.

This is a stockholder's derivative action in which the plaintiff (Schreiber) on his behalf and on behalf of the other stockholders of Pennzoil Offshore Gas Operators, Inc. (POGO) alleges that Pennzoil Company (Pennzoil) breached a fiduciary duty it owed to POGO or caused a waste of POGO's assets, by charging POGO a $650,000. management fee when POGO invested over 21 million dollars in Pennzoil Louisiana and Texas Offshore, Inc. (PLATO). Both POGO and PLATO are controlled by Pennzoil. A more detailed recitation of the underlying facts appears in *Schreiber v. Bryan*, Del.Ch., 396 A.2d 512 (1978).

After trial, for the reasons discussed, I find there was no breach of fiduciary duty or waste of corporate assets.

### I

The pertinent facts, as adduced by the testimony and exhibits at trial are: Defendant Pennzoil is a diversified natural resources company engaged in oil and gas exploration, production, transmission and marketing. Its natural gas transmission capacity is largely a result of its acquisition of United Gas Corporation, a natural gas transmission company, in the mid–1960's and of subsequent capital improvement program directed toward expansion of transmission capacity.

Later in the decade, Pennzoil's management predicted that the market for natural gas would move from a position of oversupply to one of shortage as a result of increased demand and the failure of the federal government to permit expanded exploitation of subaqueous oil and gas properties off the shore of Louisiana. It was expected that one consequence of such a shortage would be that the federal government would make oil and gas properties available by conducting lease sales. Pennzoil determined that it should participate in any future sales of offshore Louisiana leases. Nevertheless, when the federal government announced its decision to hold lease sales in December of 1970, Pennzoil believed it lacked sufficient capital to participate meaningfully in the proposed sales. Penn-

zoil therefore, in conjunction with certain investment bankers, decided to seek a way to raise sufficient capital to participate in the sales.

The result was the creation of Pennzoil Offshore Gas Operators, Inc. (POGO), a corporation organized by Pennzoil for the express purpose of raising capital in sufficiently large amounts to participate in the purchase of gas and oil leases off the shore of Louisiana and to thereafter develop any reserves discovered on the tracts for which POGO successfully bid. POGO was capitalized by the investment of Pennzoil of approximately 34 million dollars in exchange for all of POGO's Class A common stock and the investments by others, mainly institutional investors, of 130 million dollars in exchange for 130,000 units, each unit consisting of a $1,000 covertible subordinated debenture due in 1979 and 33 shares of Class B common stock. The debentures were convertible at $6 per share. Pennzoil held a 40% equity interest in POGO while the public investors held the remaining 60% interest. Pennzoil, however, was obligated to offer Pennzoil common stock in exchange for the POGO debentures in the event of a default by POGO in the payment of principal or interest on the debentures, thus effectively guaranteeing the value of the investment.

The Class A and Class B common stock were identical except that until November of 1976 the owners of Class A common stock had six votes per share while the owners of Class B common stock had one vote per share. After November 1, 1976, the designations of Class A and Class B terminated and the owners of each share was entitled to one vote per share. The effect of the voting rights differential was that Pennzoil had greater than 80% of the combined voting power during the first six years.

In addition to its 40% equity interest, Pennzoil was responsible for the management of POGO pursuant to a management contract entered into between the two corporations. POGO itself had no employees and was wholly dependent on Pennzoil for all phases of its operations. In exchange for its management of POGO, Pennzoil was to receive a management fee of 3% of all cash receipts and disbursements made by POGO with certain defined exceptions. POGO was also obligated to reimburse Pennzoil for all direct costs associated with Pennzoil's performance of the management contract and Pennzoil's furnishing of certain exploration services to POGO, although the geophysical and geological data acquired was to remain the exclusive property of Pennzoil.

At the December 1970 federal lease sale, POGO expended nearly 95 million dollars on lease acquisitions, undertaken with other bidding partners. Subsequent development of the tracts acquired showed that substantial quantities of hydrocarbons were present and POGO therefore committed itself to the exploitation of the reserves so found. Nevertheless, because it takes considerable time to develop oil and gas properties to the point of production, income from the development of the tracts was not expected to be generated until 1973 or 1974 at the earliest and POGO therefore did not have sufficient capital to invest directly in any further lease sales in 1971 and 1972.

During 1971, President Nixon announced an accelerated program of lease sales of subaqueous oil and gas properties in the Gulf of Mexico, intended to help alleviate the worsening shortage of natural gas. This schedule provided for semi–annual sales to commence in 1972 and to cover not only offshore Louisiana but also offshore Texas properties. The management of POGO, however, felt that it did not have sufficient capital to participate directly in the new sales of leases. Therefore, again after consulting with certain investment bankers, Pennzoil and POGO decided to create a sister corporation of POGO, capitalized in much the same manner as POGO, to be named Pennzoil Louisiana and Texas Offshore, Inc. (PLATO).

Prior to the formation and capitalization of PLATO the management of POGO submitted to its Class B stockholders a proposed amendment to the management con-

tract between POGO and Pennzoil which permitted "qualified affiliates" of Pennzoil to participate with POGO in future lease acquisition, exploration and development in the area of interest of POGO. These amendments were necessary because the original management agreement required Pennzoil to act in that area of interest for the exclusive benefit of POGO, except as to the tracts contiguous to those of POGO if POGO was financially unable to acquire the contiguous tracts. PLATO, as that firm was conceived, would qualify as an affiliate of Pennzoil. The plan also expanded POGO's area of interest to include the whole of the Gulf of Mexico except for tracts already acquired by Pennzoil, tracts contiguous to Pennzoil tracts, and tracts Pennzoil might be required to purchase or develop by existing contracts with third parties.

The details of the plan were disclosed to POGO shareholders by a 104 page proxy statement with annex, preliminary PLATO prospectus, and appendix dated March 21, 1972. At the annual stockholders' meeting held on April 28, 1972, the Class B stockholders overwhelmingly approved the amendments. Pennzoil, which held only Class A common stock in POGO, did not participate in the vote.

PLATO was subsequently formed and was capitalized in August of 1972, at which time POGO invested $21,666,666. in PLATO in exchange for 10,833,333 shares of PLATO Class A common stock; Pennzoil invested $34,666,666. for 17,333,333 shares of PLATO Class A common stock; and public investors invested $130,000,000. in 130,000 units consisting of one $1,000 convertible subordinated debenture due in 1979 and 40 shares of PLATO Class B common stock. As with the issuance of the original POGO debentures, Pennzoil guaranteed the PLATO debentures purchased by the public but, in this case, not the shares acquired by POGO. POGO was entitled to purchase its shares of PLATO at an originator's price of $2 per share rather than the $5 per share at which the stock was offered to the public. Pursuant to the 1970 Pennzoil–POGO management contract, Pennzoil then charged

POGO a 3% management fee on POGO's 21 million dollar investment in PLATO. The fee amounted to approximately $650,000. It is this taking of a management fee under the 1970 management agreement which Schreiber attacks.

## II

Although Schreiber originally asserted several claims, including the claim that Pennzoil diverted a corporate opportunity from POGO, the only claim which survived until trial was the claim that Pennzoil, by virtue of its position as the controlling stockholder of POGO and PLATO, owed fiduciary duties to POGO and to POGO's minority stockholders, and that it breached these duties, or perpetuated a gift or waste of corporate assets, by charging the management fee on POGO's investment in PLATO. Evidence at the trial was, therefore, limited to the issue of whether the receipt of the management fee by Pennzoil was improper because it: (1) was based on POGO's investment in PLATO which benefitted Pennzoil to the exclusion and detriment of POGO; (2) was not based on a management service within the terms of the management contract; (3) was excessive; and (4) was a double charge for the same service because Pennzoil knew it would, and in fact did, collect an identical $650,000 fee from PLATO when PLATO expended the cash POGO invested in it.

Schreiber asserts that the standard to be used in determining whether Pennzoil committed waste or breached a fiduciary duty owed by it to POGO is the intrinsic fairness rule test rather than the business judgment rule test. The business judgment rule is a presumption that a rational business decision of the officers or directors of a corporation is proper unless there exists facts which remove the decision from the protection of the rule–such as self–dealing, conflict of interest, etc. If the business judgment rule applies the objector must bear the burden of persuasion to show the impropriety of the transaction. *Maldonado v. Flynn*, Del.Ch., 413 A.2d 1251 at

1255 (1980). If an objector to a corporate transaction shows, however, that the transaction involves a parent and a subsidiary with the parent controlling the transaction and fixing the terms (as here), and shows that the parent benefitted from the transaction to the exclusion and detriment of its subsidiary, the test of propriety is not the business judgment rule but is the intrinsic fairness rule, which places the burden of persuasion on the parent corporation to show that the transaction is objectively fair. *Sinclair Oil Corporation v. Levien*, Del. Supr., 280 A.2d 717, 720 (1971).

Pennzoil denies that it benefitted from the transaction in question to the exclusion of POGO but also asserts that its act of collecting the management fee is protected by the business judgment rule even if the elements necessary to invoke the intrinsic fairness rule are present, because a majority of POGO's minority stockholders approved the amendments to the management contract after full disclosure of all germane facts, and therefore the stockholders' vote constituted a ratification of the collection of the management fee under the rationale of *Michelson v. Duncan*, Del.Supr., 407 A.2d 211, 224–225 (1979). Defendants also contend, of course, that regardless of the allocation of the burden of persuasion or the nature of the test to be applied to judge the transaction, they have shown that the collection of the management fee was intrinsically fair to POGO and its stockholders.

■ In my prior opinion in this case, *Schreiber v. Bryan*, Del.Ch., 396 A.2d 512 (1978), I may have left unclear the question of whether non–unanimous stockholder ratification of alleged corporate waste shifts the burden of persuasion from the defendants to the objecting stockholder. This issue has been clarified since that time by the Delaware Supreme Court's pronouncement in *Michelson v. Duncan*, supra. It has been the law of Delaware for some time that if a complaining stockholder shows that a parent corporation stood on both sides of a transaction with its subsidiary and shows that the parent benefitted from the transaction to the exclusion and detriment of its

subsidiary, the parent is not entitled to rely on the presumptions afforded by the business judgment rule but must bear the heavy burden of proving the intrinsic fairness of the transaction to the subsidiary. *Sinclair Oil Corporation v. Levien*, supra. The stockholders are powerless to ratify, in the sense of precluding judicial scrutiny, an alleged gift or waste of corporate assets arising from a disputed parent–subsidiary transaction except by a unanimous vote of ratification after full disclosure to them of all the germane facts concerning the transaction. *Kerbs v. California Eastern Airways*, Del.Supr., 90 A.2d 652 (1952); *Saxe v. Brady*, Del.Ch., 184 A.2d 602 (1962); *Gottlieb v. McKee*, Del.Ch., 107 A.2d 240 (1954); *Lynch v. Vickers Energy Corporation*, Del. Supr., 383 A.2d 278 (1978). *Michelson v. Duncan*, supra, has made clear, however, that a non–unanimous vote by the minority stockholders, after full disclosure of all germane facts, which seeks to ratify an alleged wasteful transaction is not a nullity but has the effect of placing the burden of persuasion on the party attacking the transaction. *Michelson v. Duncan*, supra; *Gottlieb v. Heyden Chemical Co.*, Del.Supr., 90 A.2d 660 (1952); *Fidanque v. American Maracaibo Co.*, Del.Ch., 92 A.2d 311 (1952); *Kaufman v. Shoenberg*, Del.Ch., 91 A.2d 786 (1952). Since, in the present case 96% of the shares voted favored the amendments and only 4% of the shares voted disapproval, it is undisputed that POGO's Class B shareholders overwhelmingly approved the amendments to the POGO–Pennzoil management contract necessary to permit the formation of PLATO and permit POGO's investment in it. This action constituted approval of the charging of the management fee by Pennzoil if the stockholders were fully informed about the fee. The only remaining question on the allocation of the burden of persuasion, therefore, is whether POGO's stockholders were fully informed with complete candor of all the germane facts surrounding the disputed transaction. *Lynch v. Vickers Energy Corporation*, supra.

I find that POGO's stockholders were so informed. The proxy statement furnished by POGO's management in connection with the proposed amendments to the management contract was quite explicit about the reasons for which the amendments were proposed. It stated:

"Pennzoil and the Company [POGO] have recently organized a new corporation, Pennzoil Louisiana and Texas Offshore, Inc. (Plato), which is intended to be used as a Qualified Affiliate [defined elsewhere in the proxy statement] if the Amendment is adopted . . .

\* \* \* \* \* \*

It is presently contemplated that if the Amendment is approved, Plato would make an underwritten public offering (Offer) of its securities similar to the public offering made by the Company in November 1970 and that Pennzoil and the Company would acquire a substantial equity investment in Plato. Although plans are subject to changes as described in the following paragraph, it is now contemplated that Plato would offer $130,000,000 principal amount of Convertible Subordinated Debentures due 1979 and 5,200,000 shares of its Class B Common Stock, such offering to be made in units consisting of $1,000 principal amount of Convertible Subordinated Debentures and 40 shares of Class B Common Stock. Prior to the consummation of the Offer, Pennzoil would acquire 17,333,333 shares of the Class A Common Stock of Plato for $34,666,666, and the Company would acquire 10,833,333 shares of such stock for $21,666,666.

\* \* \* \* \* \*

The concept, structure and details of the Amendment were determined through discussions among persons having simultaneous relationships with both the Company and Pennzoil in their capacities as officers or directors thereof. See "Relationship of the Company and Pennzoil." Accordingly, while such persons have acted in good faith, there was no arms–length bargaining.

\* \* \* \* \* \*

It is contemplated that Pennzoil and Plato will enter into a management contract pursuant to which Pennzoil will administer all phases of Plato's business. Such management contract is expected to be substantially the same as the Company's Management Contract with Pennzoil, except that the area of interest to be designated for Plato will exclude those lease blocks offshore Louisiana presently owned by the Company and 71 lease blocks immediately adjacent or cornering thereto. See the map on page 12 of the Preliminary Prospectus."

With regard to the management fee payable by POGO to Pennzoil, the proxy statement said:

"For its services under the Management Contract, Pennzoil receives a management fee, payable monthly, equal to (a) 3% of all cash disbursements by the Company (other than funds for the payment of the principal of the Company's Debentures and its loan indebtedness, funds invested in short–term interest obligations and funds paid to Pennzoil as part of the management fee) plus (b) 3% of all cash receipts of the Company (other than borrowed funds, proceeds realized from the Company's issuance and sale of securities and proceeds, exclusive of interest and profits, realized from short–term interest bearing obligations in which the Company has invested its funds). For the year ended December 31, 1971, the management fee payable by the Company to Pennzoil amounted to approximately $4,123,000."

Moreover, the proxy statement contained as an appendix or exhibit the complete preliminary prospectus of PLATO which set forth, among other things, the fact that POGO would invest $21,666,666. in securities of PLATO, the existence of a management contract between Pennzoil and PLATO, and the terms of the management contract.

From the proxy materials submitted to the stockholders, a reasonably prudent investor should have realized not only the

purpose for which the amendments were offered–the creation of PLATO for the benefit of POGO and Pennzoil–but also that POGO would invest in PLATO. It was also clear from the terms of the POGO–Pennzoil management fee contract which was fully set forth, including the method of calculating the management fee, that a 3% management fee would be charged on POGO's investment in PLATO by Pennzoil and that a similar 3% management fee would be charged when PLATO expended the funds. And although it would have been clearer and therefore better for POGO to have set out in its proxy materials the dollar amounts of the two charges, its failure to do so does not constitute a failure to fully disclose all the germane facts with complete candor. In any event I find that it was highly unlikely that the assessment of the management fee of $650,000. on the $21,666,666. investment in PLATO by POGO would have deterred any POGO stockholder from approving the amendments on their merits in view of the nature and magnitude of the transaction and its economic importance to POGO.

Since the proxy materials disseminated in connection with the proposed amendments to POGO's management contract with Pennzoil fully informed POGO's stockholders of the purposes and effect on POGO of the amendments, the stockholders' fully–informed vote to approve the amendments operated as a non–unanimous vote of ratification of POGO's investment in PLATO, including POGO's payment to Pennzoil of the $650,000. management fee accompanying the investment. This non–unanimous vote was not sufficient to ratify, in the sense of precluding further judicial inquiry, the investment and charge, but it did impose on Schreiber–the objecting party–the burden of persuasion to show that the payment of the management fee was improper. *Michelson v. Duncan,* supra; *Gottlieb v. Heyden Chemical Co.,* supra.

Notwithstanding that Schreiber had the burden of persuasion, I, at the pre-trial conference, imposed upon the defendants the duty to go forward and present at the trial the facts relating to the transaction since these facts were peculiarly within their knowledge. This requirement that the defendants adduce their evidence first at the trial did not, however, assign to them the burden of persuasion, which burden rests with Schreiber, the plaintiff. See McCORMICK'S *Handbook of the Law of Evidence,* 2nd, § 336, 337; *Bennett v. Andree,* Del.Super., 264 A.2d 353 (1970), aff'd., Del.Supr., 270 A.2d 173 (1970).

### III

The evidence at trial focused on three issues. These were, *first,* whether POGO's investment in PLATO was an event of managerial service to which the management contract applied; *secondly,* whether the size of the management fee was excessive in view of the services Pennzoil provided POGO in connection with the investment in PLATO; and *thirdly,* whether POGO's investment in PLATO was made for the sole benefit of Pennzoil to the exclusion and detriment of POGO. I find that the evidence shows that there were no improprieties on the part of Pennzoil.

■ 1. Pennzoil's right to charge a management fee for its services depends exclusively on the management contract. That contract provides in pertinent part:

"NOW, THEREFORE, the parties hereto agree as follows:

1. Management Services. Manager shall manage for Company all phases of Company's business.

\* \* \* \* \* \*

2. Compensation for Management Services. As compensation for the management services provided for in paragraph 1 above, Company shall pay to Manager the following:

a. An amount equal to 3% of all cash disbursements by Company (including all cash disbursements made to Manager by Company pursuant to this Agreement) other than (i) funds for the payment of the principal of Company's debentures and its other loan indebtedness, (ii) funds invested in short–term

interest bearing obligations, and (iii) funds paid to Manager pursuant to this paragraph 2; and

b. An amount equal to 3% of all cash receipts by Company other than (i) borrowed funds, including the proceeds realized from the Company's sale and issuance of its debentures, (ii) proceeds realized from the Company's sale and issuance of Company stock and other Company securities, and (iii) proceeds (other than interest and profits) realized from short–term interest bearing obligations in which Company has invested its funds."

It is clear from the terms of the management contract that a 3% charge was payable by POGO to Pennzoil on all cash disbursements except those specifically mentioned. POGO's investment in PLATO does not fall within any of the exceptions, was within the broad definition of "all phases of the Company's business" set forth in the management contract, and was therefore an event to which the management contract properly applies.

█ 2. The management fee was not excessive in view of the services Pennzoil provided POGO in connection with POGO's investment in PLATO. The evidence adduced at trial showed that not only did Pennzoil bear the burden of financing preparatory work in the organization of PLATO, but also undertook to guarantee the value of the public investment in PLATO by offering to exchange Pennzoil common stock for the PLATO debentures of like value in the event of a default on them. POGO did not share in the burden of this backup or guarantee although it received the same originator's price of $2 per share as did Pennzoil, which was less than one–half the market price of $5 per share on the date of issuance. The value of PLATO stock has never fallen below $2 per share and Pennzoil has recently performed on its backup of the PLATO shares by paying $4 per share for all non–Pennzoil owned shares. POGO's stock ownership therefore doubled in value between its date of acquisition and its date of disposition. POGO's

investment in PLATO also permitted it to participate in exploration and development of oil and gas properties in offshore Texas when it had neither the geological data nor the capital to explore or develop in the area alone. There were, therefore, very real benefits flowing to POGO from the management services provided by Pennzoil in connection with the formation of PLATO and the investment in it by POGO. Under the totality of the circumstances it is clear that the management fee charged by Pennzoil to POGO on its investment in PLATO was not excessive.

Schreiber also asserts, however, that the management fee was excessive because Pennzoil knew it would receive both a $650,000 management fee from POGO on POGO's investment in PLATO and that it would receive another $650,000 management fee from PLATO when PLATO disbursed the money POGO had invested in it in the normal course of PLATO's business. Although Schreiber characterizes this as "double dipping" for the same service, it is clear that Pennzoil performed separate and distinct services in connection with each charge. The first charge related to services provided to POGO in connection with the formation of PLATO and POGO's investment in it, while the second charge related to services provided to PLATO in investing in potential oil and gas properties and in their development. I therefore find that the charges made by Pennzoil were made pursuant to the terms of the management contract and were not excessive.

█ 3. Finally, I must determine if Pennzoil caused POGO to invest in PLATO for the sole benefit of Pennzoil and to the detriment of POGO. The facts adduced at trial show that POGO was financially incapable of participating meaningfully in lease sales under the accelerated lease program announced by the federal government in 1971 because it had already expended or committed such a large percentage of its available funds on lease acquisition and development that it could not obtain adequate loan financing to further expand its holdings. Although POGO's geological pros-

pects for locating commercial quantities of oil and gas on its leased tracts were very good, it could not show the proven reserves necessary to obtain commercial leases. Moreover, because of the nature of the industry, I find it was economically important for POGO and Pennzoil to participate in the early lease sales in the area offshore Texas, because they would then be able to accumulate a greater knowledge of the geological and geophysical characteristics of the area for use in future lease offerings. Therefore, both Pennzoil and POGO had a valid business interest in finding a way to participate in the 1972 lease sales if they were to maintain a viable and continuing presence in the area.

The formation of PLATO and the method utilized to enable POGO and Pennzoil to participate in the 1972 sales clearly did not exclude POGO from the benefits of its investment; on the contrary, POGO not only received a favorable originator's price on the amount of its investment, but it was also able to participate in the 1972 offshore Texas lease sales, which it could not have done without the formation of PLATO because of its lack of geological data, insufficient cash flow, and inability to borrow. The evidence does not show, therefore, that Pennzoil caused POGO to invest in PLATO solely for Pennzoil's benefit. POGO stood to gain from the transaction, and stood to gain more—proportionately to its investment—than Pennzoil, since Pennzoil was burdened by the guarantee offered by it of the value of the public investment in PLATO. In retrospect, it is also clear that POGO realized a substantial profit from its investment in PLATO.

### IV

I have concluded that Schreiber had the burden of showing that the payment of the management fee constituted corporate waste or was a breach of fiduciary duty and that he has not succeeded in bearing this burden. I also conclude that even if the burden of persuasion did not fall upon Schreiber and that Pennzoil had the burden of showing the intrinsic fairness of the en-

tire transaction, the transaction was in fact intrinsically fair to POGO and to its stockholders. I reach this conclusion on the basis of the evidence adduced by the defendants at trial: the fee charged by Pennzoil on POGO's investment in PLATO was clearly dictated by the management contract and involved no overreaching or improper self–dealing by Pennzoil. Moreover, the amount of the management fee charged is clearly reasonable in view of the benefits accruing to POGO by virtue of Pennzoil's efforts in forming PLATO and in permitting POGO to participate in PLATO at an originator's price. Finally, far from operating in such a manner as to exclude POGO from the benefits of its investment in PLATO, Pennzoil offered POGO an even more valuable interest in PLATO than Pennzoil itself held since POGO was not obliged to participate in Pennzoil's guarantee of the PLATO debentures. Indeed, the comparative value of POGO's investment to that of Pennzoil has been shown by Pennzoil's recent purchase, under its guarantee, of the PLATO shares not owned by Pennzoil at $4 per share–a price which permitted POGO to make a substantial profit on its investment in PLATO but which renders Pennzoil's similar investment only minimally profitable.

### V

In conclusion, I find that the burden of persuasion rested upon Schreiber to show that the transaction in question was wasteful or was not the result of sound business judgment, that Schreiber has failed to bear this burden of proof, and that in any event the facts adduced at trial show that the entire transaction was intrinsically fair to POGO and to its stockholders. I therefore conclude that judgment must be entered for the defendants. Counsel for defendants may submit an Order.