# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| JOHN CALMA, Derivatively on Behalf of CITRIX SYSTEMS, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. 9579-CB |
| | ) | |
| MARK B. TEMPLETON, THOMAS F. BOGAN, GARY E. MORIN, NANCI E. CALDWELL, STEPHEN M. DOW, MURRAY J. DEMO, GODFREY R. SULLIVAN, ASIFF S. HIRJI, and ROBERT D. DALEO, | ) | |
| | ) | |
| Defendants, | ) | |
| | ) | |
| and | ) | |
| | ) | |
| CITRIX SYSTEMS, INC., a Delaware corporation, | ) | |
| | ) | |
| Nominal Defendant. | ) | |

## OPINION

Date Submitted: February 2, 2015
Date Decided: April 30, 2015

Nicholas J. Rohrer of YOUNG CONAWAY STARGATT & TAYLOR, LLP, Wilmington, Delaware; Brian J. Robbins, Felipe J. Arroyo and Jenny L. Dixon of ROBBINS ARROYO LLP, San Diego, California; *Attorneys for Plaintiff*.

Thomas A. Beck and Susan M. Hannigan of RICHARDS, LAYTON & FINGER, P.A., Wilmington, Delaware; Brian E. Pastuszenski and Daniel Roeser of GOODWIN PROCTER LLP, New York, New York; *Attorneys for Defendants*.

Kenneth J. Nachbar of MORRIS, NICHOLS, ARSHT & TUNNELL LLP, Wilmington, Delaware; *Attorneys for Nominal Defendant*.

**BOUCHARD, C.**

## I.    INTRODUCTION

Over the past six decades, Delaware courts have issued numerous decisions concerning ratification of compensation paid to non-employee directors. This Opinion surveys that jurisprudence to determine whether stockholder approval of a compensation plan subjects the self-interested payment of compensation to non-employee directors under such a plan to judicial review under a waste standard instead of an entire fairness standard.

In this derivative action, a stockholder challenges awards of restricted stock units (RSUs) that were granted to eight non-employee directors of Citrix Systems, Inc. ("Citrix" or the "Company") in 2011, 2012, and 2013 (the "RSU Awards"). The majority of the directors' compensation consisted of these RSU Awards, which the board's compensation committee granted under the Company's 2005 Equity Incentive Plan (the "Plan"). That Plan, along with subsequent amendments thereto, was approved by a majority of Citrix's disinterested stockholders in informed and uncoerced votes.

Citrix's directors, officers, employees, consultants, and advisors were all beneficiaries under the Plan. The only limit on compensation the Plan imposed is that no beneficiary could receive more than one million shares (or RSUs) per calendar year. There were no sub-limits based on the beneficiary's position at Citrix. Based on Citrix's stock price when this action was filed, one million RSUs were worth over $55 million.

The plaintiff contends that the RSU Awards were, when combined with the cash payments that Citrix's non-employee directors received, "excessive" in comparison with the compensation received by directors at certain of Citrix's "peers." The plaintiff seeks

1

to recover against the defendants, the members of Citrix's board, under three theories of liability: (i) breach of fiduciary duty (Count I); (ii) waste of corporate assets (Count II); and (iii) unjust enrichment (Count III).

The plaintiff does not contend that Citrix stockholders failed to approve the Plan; that Citrix stockholders were not fully informed when they approved the Plan; or that the RSU Awards violated the Plan. Rather, he asserts that the defendants must establish the entire fairness of the RSU Awards as conflicted compensation decisions because the Plan does not have any "meaningful limits" on the annual stock-based compensation that Citrix directors can receive from the Company.

The defendants moved to dismiss the complaint in its entirety under Court of Chancery Rule 12(b)(6) for failure to state a claim upon which relief may be granted, and under Court of Chancery Rule 23.1 for failure to make a pre-suit demand upon Citrix's board or to plead facts excusing such a demand. The defendants' primary argument is a ratification defense, but they concede that Citrix stockholders were not asked to ratify the specific RSU Awards at issue here.[1] Instead, the defendants contend that Citrix stockholders ratified the Plan so that any award of RSUs to the directors under the generic one million RSU limit in the Plan must be reviewed under a waste standard. They further contend that it is not reasonably conceivable that the RSU Awards constituted waste.

---

[1] Tr. of Oral Arg. 7.

2

In this opinion, I conclude that the plaintiff has established that demand is futile because a majority of the Citrix board in office when the complaint was filed were interested by virtue of receiving the RSU Awards. Thus, the defendants' Rule 23.1 motion is denied.

I further conclude that the defendants have not established that Citrix stockholders ratified the RSU Awards because, in obtaining omnibus approval of a Plan covering multiple and varied classes of beneficiaries, the Company did not seek or obtain stockholder approval of any action *bearing specifically on the magnitude of compensation to be paid to its non-employee directors*. Accordingly, because the RSU Awards were self-dealing decisions, the operative standard of review is entire fairness, and it is reasonably conceivable that the total compensation received by the non-employee directors was not entirely fair to the Company. I also conclude that it is reasonably conceivable that the defendants were unjustly enriched by the RSU Awards, but not that the RSU Awards constituted waste. Therefore, the defendants' Rule 12(b)(6) motion is granted as to Count II and denied as to Counts I and III.

## II.    BACKGROUND[2]

### A.    The Parties

Nominal Defendant Citrix, a Delaware corporation based in Fort Lauderdale, Florida, provides virtualization, networking, and cloud infrastructure services to

---

[2] Unless noted otherwise, the facts recited in this opinion are based on the allegations of the Verified Shareholder Derivative Complaint for Breach of Fiduciary Duty, Waste of Corporate Assets, and Unjust Enrichment (the "Complaint").

businesses and consumers. It is well known for its GoToMeeting product, which is a video conferencing service.

Defendants Mark B. Templeton, Thomas F. Bogan, Gary E. Morin, Nanci E. Caldwell, Stephen M. Dow, Murray J. Demo, Godfrey R. Sullivan, Asiff S. Hirji, and Robert D. Daleo (collectively, the "Board" or the "Defendants") were the nine members of Citrix's board of directors when the Complaint was filed. They all have been directors of Citrix since July 2008, with the exception of Daleo, who became a director in May 2013. Templeton, as the Company's Chief Executive Officer and President, is the only employee director.[3] Since at least April 2010, Bogan, Morin (as chair), and Caldwell have constituted the Board's Compensation Committee.

Plaintiff John Calma ("Plaintiff") has been a Citrix stockholder at all relevant times.

B. **Citrix's 2005 Equity Incentive Plan**

On May 25, 2005, a majority of Citrix's stockholders approved the Plan. The Plan was adopted in part "to advance the interests of Citrix Systems, Inc. . . . by encouraging ownership of Stock by employees, directors, officers, consultants or advisors of the Company" and by "attracting and retaining the best available individuals for service as directors of the Company."[4]

---

[3] Templeton's compensation from Citrix is not at issue in this action.

[4] Defs.' Ex. B (Plan) § 1; Compl. ¶ 16. Because the Plan is integral to Plaintiff's claims and incorporated by reference into the Complaint, it is properly before the Court on Defendants' motion to dismiss. *See In re Santa Fe Pac. Corp. S'holder Litig.*, 669 A.2d 59, 69-70 (Del. 1995).

The Plan initially encompassed 10.1 million total shares, of which 500,000 shares could be awarded as RSUs.[5] Those terms have since been amended several times. The Plan currently encompasses 48.6 million total shares, of which 16 million shares can be awarded as RSUs. As of the filing of the Complaint, there were over 16 million shares available under the Plan, with 11 million shares available to be granted as RSUs.[6]

Under Section 6.1(a) of the Plan, the persons eligible to receive an equity award include Citrix's directors, officers, employees, consultants, and advisors.[7] Subject to adjustments not relevant here, Section 6.1(b) of the Plan limits the total number of shares covered by an award that any beneficiary can receive under the Plan in a calendar year to 1 million shares.[8] The Plan does not specify the compensation that the Company's non-employee directors will receive annually. There are no sub-limits varied by position with the Company, such as a limit for non-employee directors and a different limit for officers. The only limit on annual compensation under the Plan is the generic 1 million share limit set forth in Section 6.1(b) applicable to all beneficiaries.

---

[5] Plan § 4.

[6] Compl. ¶ 17.

[7] Plan § 6.1(a) ("The Committee may grant from time to time and at any time prior to the termination of the Plan one or more Awards . . . to any employee of, officer of, consultant to or advisor to . . . the Company . . . or to [any] non-employee member of the Board[.]").

[8] *Id.* § 6.1(b) ("[I]n no event shall the number of shares of Stock covered by Options or other Awards granted to any one person in any one calendar year exceed 1,000,000 shares of Stock."). The Plan defines "Award" as "any grant or sale pursuant to the Plan of Options, Stock Appreciation Rights, Performance Units, Restricted Stock, Restricted Stock Units, or Stock Grants." *Id.* § 2.4.

The Compensation Committee is authorized to administer the Plan, although the Board "may itself exercise any of the powers and responsibilities assigned [to] the Committee under the Plan."[9]  The Plan empowers the Compensation Committee with broad discretion to determine the amount and form of the awards to be granted under the Plan.  Specifically, Section 5 of the Plan provides:

> Subject to the provisions of the Plan, *the Committee shall have complete authority, in its discretion, to make or to select the manner of making all determinations with respect to each Award to be granted by the Company* under the Plan *including the* employee, *director*, officer, consultant or advisor *to receive the Award and the form of Award.*  In making such determinations, the Committee may take into account the nature of the services rendered by the respective employees, directors, officers, consultants, and advisors, their present and potential contributions to the success of the Company and its Affiliates, and such other factors as the Committee in its discretion shall deem relevant.[10]

Section 5 thus grants to the Compensation Committee (or the Board) the "authority to decide how many awards it can grant to its members and other directors, subject only to the amount of stock limitations."[11]  In Plaintiff's view, the one-million-share limit on awards per person per calendar year is "specious" because, based on the Company's stock price in July 2014 when the Complaint was filed, a grant of one million shares to a single person would have been worth over $55 million.[12]

---

[9] *Id.* § 5; Compl. ¶ 18.

[10] Plan § 5 (emphasis added).

[11] Compl. ¶ 20.

[12] *Id.*

6

### C. Compensation Received by Non-Employee Directors in 2010

In 2010, consistent with the Board's previously-announced director compensation practice,[13] the Compensation Committee granted 3,333 RSUs, with a grant date fair value of $143,852, and 10,000 options, with a grant date fair value of $101,116, to the Company's non-employee directors. The directors also received cash compensation between $43,750 and $67,072, bringing their total 2010 compensation to between $288,718 and $312,040.

Table 1 below reflects the total value of the RSUs, options, and cash compensation the Company's non-employee directors received in 2010.

| Table 1 Non-Employee Director Compensation in 2010[14] | | | | |
|---|---|---|---|---|
| Director | RSU Awards | Options | Cash | Total |
| Bogan | $143,852 | $101,116 | $62,187 | $307,155 |
| Morin | $143,852 | $101,116 | $47,500 | $292,468 |
| Caldwell | $143,852 | $101,116 | $43,750 | $288,718 |
| Dow | $143,852 | $101,116 | $67,072 | $312,040 |
| Demo | $143,852 | $101,116 | $60,938 | $305,906 |
| Sullivan | $143,852 | $101,116 | $47,500 | $292,468 |
| Hirji | $143,852 | $101,116 | $47,500 | $292,468 |

---

[13] *See* Defs.' Ex. H at 5-6 (Citrix Systems, Inc. Proxy Statement (Schedule 14A), at 30-31 (Apr. 14, 2006)) ("Annually, beginning in 2006, each non-employee director will be eligible to receive an option to purchase 10,000 shares of the Company's Common Stock and a restricted stock award of 3,333 shares of the Company's Common Stock."). I rely upon this source solely to provide additional background for the RSU Awards.

[14] Compl. ¶ 24.

**D. Compensation Received by Non-Employee Directors in 2011-2013**

In 2011, the Compensation Committee recommended, and the Board approved, a change to the Company's director compensation practices. The Board approved this change without obtaining stockholder approval, which, as Plaintiff acknowledges, was not required under Delaware law or under the Plan.[15]

Starting in 2011, the equity compensation for non-employee directors was an annual grant of 4,000 RSUs for returning directors and a one-time grant of 10,000 RSUs for new directors.[16] The RSUs for returning directors would be awarded in June after the Company's annual meeting and would vest equally in monthly installments over one year. The RSUs for new directors likewise would be awarded in June and would vest equally in annual installments over three years. The non-employee directors also would receive cash compensation, but they would no longer receive any options.[17]

In June 2011, the Compensation Committee awarded 4,000 RSUs, with a grant date fair value of $339,320, to each of the Company's non-employee directors. Those directors also received cash compensation between $47,396 and $86,250, bringing their

---

[15] *Id.* ¶ 22.

[16] *Id.*

[17] Plaintiff alleges that the change in director compensation from 2010 to 2011 is "all the more drastic" because "the Company's stock price dropped almost immediately after the equity stock awards grant in 2011," meaning that any options issued to the Company's non-employee directors in 2011 "would have been worthless." *Id.* But, Plaintiff does not allege that the Board knew at the time that the Company's stock price would drop, nor does Plaintiff assert any breach of fiduciary duty claim under *Brophy v. Cities Serv. Co.*, 70 A.2d 5 (Del. Ch. 1949).

total 2011 compensation to between $386,716 and $425,570. This reflected an average increase of approximately $100,000 from their total compensation in 2010.

In June 2012, the Compensation Committee awarded another 4,000 RSUs, with a grant date fair value of $283,160, to each of the Company's non-employee directors. Those directors also received cash compensation between $50,000 and $105,000, bringing their total 2012 compensation to between $333,160 and $388,160.

In June 2013, the Compensation Committee again awarded 4,000 RSUs, with a grant date fair value of $253,360, to each of the Company's returning, non-employee directors. Those directors also received cash compensation between $50,000 and $105,000, bringing their total 2013 compensation to between $303,360 and $358,360. The Compensation Committee also awarded 10,000 RSUs, with a grant date fair value of $633,400, to Daleo, a new, non-employee director. Daleo also received $29,535 in cash, bringing his total 2013 compensation to $662,935.

Table 2 below reflects the total value of the RSU Awards and cash compensation the Company's non-employee directors received in 2011-2013.

| Director | Fiscal Year | RSU Awards | Cash | Total |
|---|---|---|---|---|
| **Table 2** — **Non-Employee Director Compensation in 2011-2013**[18] | | | | |
| Bogan | 2011 | $339,320 | $86,250 | $425,570 |
| | 2012 | $283,160 | $105,000 | $388,160 |
| | 2013 | $253,360 | $105,000 | $358,360 |
| Morin | 2011 | $339,320 | $54,792 | $394,112 |
| | 2012 | $283,160 | $60,000 | $343,160 |
| | 2013 | $253,360 | $60,000 | $313,360 |
| Caldwell | 2011 | $339,320 | $47,396 | $386,716 |
| | 2012 | $283,160 | $50,000 | $333,160 |
| | 2013 | $253,360 | $50,000 | $303,360 |
| Dow | 2011 | $339,320 | $69,583 | $408,903 |
| | 2012 | $283,160 | $90,000 | $373,160 |
| | 2013 | $253,360 | $90,000 | $343,360 |
| Demo | 2011 | $339,320 | $71,146 | $410,466 |
| | 2012 | $283,160 | $80,000 | $363,160 |
| | 2013 | $253,360 | $80,000 | $333,360 |
| Sullivan | 2011 | $339,320 | $54,792 | $394,112 |
| | 2012 | $283,160 | $70,000 | $353,160 |
| | 2013 | $253,360 | $70,000 | $323,360 |
| Hirji | 2011 | $339,320 | $54,792 | $394,112 |
| | 2012 | $283,160 | $60,000 | $343,160 |
| | 2013 | $253,360 | $60,000 | $313,360 |
| Daleo | 2013 | $633,400 | $29,535 | $662,935 |

## E.    Procedural History

On April 28, 2014, Plaintiff filed this action derivatively on behalf of Citrix.[19]

The Complaint asserts three claims against Defendants for approving and/or receiving the

---

[18] Compl. ¶¶ 7-14.

[19] On May 6, 2014, Plaintiff filed a corrected complaint that included an inadvertently deleted graphic.

RSU Awards in 2011, 2012, and 2013: (i) breach of fiduciary duty (Count I); (ii) waste of corporate assets (Count II); and (iii) unjust enrichment (Count III).

On July 21, 2014, Defendants moved to dismiss the Complaint in its entirety under Court of Chancery Rules 12(b)(6) and 23.1. On January 6, 2015, I heard oral argument on Defendants' motion, at which time I requested supplemental briefing on the Company's treatment of abstentions and broker "non-votes" in its vote calculations. On February 2, 2015, the parties completed this supplemental briefing.

## III.   LEGAL ANALYSIS

### A.   Demand is Excused as to Counts I-III

"Because the shareholders' ability to institute an action on behalf of the corporation inherently impinges upon the directors' power to manage the affairs of the corporation the law imposes certain prerequisites on a stockholder's right to sue derivatively."[20] Under Court of Chancery Rule 23.1, because Plaintiff did not make a demand on the Board prior to filing the Complaint,[21] he must allege with particularity that his failure to make a demand should be excused.[22] Plaintiff alleges that demand is excused for two related reasons: (i) a majority of the Board stood "on both sides" of the decision in 2011 to change the Company's director compensation practices to what became the RSU Awards; and (ii) a majority of the Board "lack disinterest" because they

---

[20] *Kaplan v. Peat, Marwick, Mitchell & Co.*, 540 A.2d 726, 730 (Del. 1988).

[21] Compl. ¶ 33.

[22] *See, e.g.*, *Wood v. Baum*, 953 A.2d 136, 140 (Del. 2008).

11

"derived a personal financial benefit from and had a direct interest in" receiving the RSU Awards.[23]

There are two tests for demand futility under Delaware law: (i) the test articulated in *Aronson v. Lewis*,[24] which applies when a plaintiff challenges "a decision of the board upon which plaintiff must seek demand";[25] and (ii) the test set forth in *Rales v. Blasband*,[26] which applies when a plaintiff does not challenge "a decision of the board in place at the time the complaint is filed."[27] To establish demand futility, Plaintiff must impugn the ability of at least half of the directors in office when the Complaint was filed to have considered a demand impartially.[28] The focus is on the entire board in office, rather than only the directors who approved any decision(s) at issue, because the core purpose of the demand futility test is to determine whether "the impartial directors . . . have the power unilaterally to cause the corporation to act on the demand."[29]

The parties assert that the *Aronson* test should govern, but, in my view, the *Rales* test applies to the facts alleged here. The Complaint ostensibly challenges the Board's decision in 2011 to change its director compensation practices, but that was simply a

---

[23] Compl. ¶ 34.

[24] 473 A.2d 805 (Del. 1984).

[25] *Ryan v. Gifford*, 918 A.2d 341, 353 (Del. Ch. 2007).

[26] 634 A.2d 927 (Del. 1993).

[27] *Ryan*, 918 A.2d at 352.

[28] *See Beneville v. York*, 769 A.2d 80, 82 (Del. Ch. 2000).

[29] *Id.* at 86.

change in board policy. The actual business decisions at issue in this case, in my opinion, were those that the three members of the Compensation Committee made to grant the RSU Awards in 2011, 2012, and 2013.

The entire Board did not approve the RSU Awards; only the Compensation Committee did. There is no dispute that the Compensation Committee had the authority to issue the RSU Awards under Section 5 of the Plan and under Delaware law as a committee of the Board.[30] At all relevant times, the Citrix board of directors had at least eight members, meaning that at no point in time did the three members of the Compensation Committee constitute a majority (or even half) of the Board. Unlike in *Ryan v. Gifford*,[31] where Chancellor Chandler applied *Aronson* because the unanimous decisions of a three-member compensation committee could be imputed to the six members of the board "for purposes of proving demand futility,"[32] the decisions of the Compensation Committee here to grant the RSU Awards cannot be imputed to the Board. Rather, this case is analogous to *Conrad v. Blank*,[33] where the Court applied the *Rales* test to derivative claims challenging grants of backdated options approved by a compensation committee consisting of less than half of the directors in office when the

---

[30] 8 *Del. C.* § 141(c) (providing that the board of directors may establish a committee endowed with the full authority of the board).

[31] 918 A.2d 341 (Del. Ch. 2007).

[32] *Id.* at 353, 353 n.29 ("Where half or more of the board has already approved a corporate action, even acting through a committee, there is no need for a shareholder to give the entire board a second bite at the apple.").

[33] 940 A.2d 28 (Del. Ch. 2007).

13

lawsuit was initiated.[34]  Thus, in my view, because the decisions to grant the RSU Awards were made by less than half of the Citrix directors in office when Plaintiff filed the Complaint, the *Rales* test applies.

Under *Rales*, Plaintiff's derivative claims must be dismissed under Court of Chancery Rule 23.1 unless, based on the particularized facts alleged, Plaintiff creates "a reasonable doubt that, as of the time the complaint is filed, the board of directors could have properly exercised its independent and disinterested business judgment in responding to a demand."[35]  In this analysis, all particularized allegations in the Complaint are accepted as true, and all reasonable inferences logically flowing from those particularized allegations are drawn in Plaintiff's favor.[36]  Most relevant here, a director is not disinterested if he or she "appear[s] on both sides of a transaction [or] expect[s] to derive any personal financial benefit from it in the sense of self-dealing."[37]

Defendants argue that a director is not deemed interested simply because he or she received compensation from the corporation unless Plaintiff is able to show that the compensation received was material to that individual, which they contend Plaintiff has

---

[34] *See id.* at 37 ("Since the challenged transaction was not made by the board, or even half of its members, the test articulated in *Rales* is the proper standard."); *see also Desimone v. Barrows*, 924 A.2d 908, 947 (Del. Ch. 2007) (applying the *Rales* test to derivative claims challenging the options granted to a majority of the board by operation of a stockholder-approved plan).

[35] *Rales*, 634 A.2d at 934.

[36] *See Brehm v. Eisner*, 746 A.2d 244, 255 (Del. 2000).

[37] *Aronson*, 473 A.2d at 812.

14

not done.[38]  In opposition, Plaintiff contends that where, as here, there are derivative claims challenging the compensation received by directors, those directors are interested for demand futility purposes because they "have a personal financial interest in their compensation for their service as directors," regardless of whether the compensation they received was material to them personally.[39]  Accordingly, Plaintiff submits that demand is excused here because he challenges the RSU Awards received by a majority of the Board in office when the Complaint was filed.  I agree with Plaintiff.

Under Delaware law, directors are generally not considered interested under *Aronson* or *Rales* "simply because [they] receive compensation from the company."[40] But, a derivative challenge to director compensation is different because the law is skeptical that an individual can fairly and impartially consider whether to have the corporation initiate litigation challenging his or her own compensation, regardless of whether or not that compensation is material on a personal level.

---

[38] Defs.' Op. Br. 31.

[39] Pl.'s Ans. Br. 8.

[40] *Weiss v. Swanson*, 948 A.2d 433, 448 (Del. Ch. 2008) (citing *A.R DeMarco Enters., Inc. v. Ocean Spray Cranberries, Inc.*, 2002 WL 31820970, at *5 (Del. Ch. Nov. 26, 2002, revised Dec. 4, 2002)).

Drawing on Chancellor Allen's analysis in *Steiner v. Meyerson*,[41] I concluded in *Cambridge Retirement System v. Bosnjak*[42] that, in a derivative challenge to director compensation, there is a reasonable doubt that the directors who received the compensation at issue—regardless of whether that compensation was material to them on a personal level—can be sufficiently disinterested to consider impartially a demand to pursue litigation challenging the amount or form of their own compensation.[43] In my view, this conclusion has even more force where, as here, the directors received equity compensation from the corporation because those individuals "have a strong financial incentive to maintain the status quo by not authorizing any corrective action that would devalue their current holdings or cause them to disgorge improperly obtained profits."[44]

Here, eight of the nine Citrix directors in office when Plaintiff filed the Complaint received the RSU Awards from the Company. Plaintiff alleged with sufficient particularity that those eight directors are "interested" by identifying the amount and form of the RSU Awards they received from the Company during 2011-2013. As in *Steiner* and *Bosnjak*, Plaintiff need not establish that the RSU Awards were material to the Company's non-employee directors. Since a majority of the Board is interested, Plaintiff

---

[41] 1995 WL 441999, at *4, *11 (Del. Ch. July 19, 1995) (concluding that directors were "interested" in the stock options they received from the company without analyzing whether the compensation was material to them individually).

[42] 2014 WL 2930869 (Del. Ch. June 26, 2014).

[43] *See id.* at *3-6; *see also London v. Tyrrell*, 2008 WL 2505435, at *5 (Del. Ch. June 24, 2008).

[44] *Conrad*, 940 A.2d at 38.

16

has raised a reasonable doubt as to the ability of the Board to impartially consider whether or not to pursue a claim challenging the RSU Awards.[45] Because each of Counts I-III challenges the RSU Awards, demand is excused as futile for each of those Counts.[46] Defendants' motion to dismiss the Complaint under Rule 23.1 is therefore denied.

## B. Count I States a Claim for Breach of Fiduciary Duty

In Count I, Plaintiff alleges that Defendants breached their fiduciary duty of loyalty "by awarding and/or receiving excessive and improper compensation at the expense of the Company" in the form of the RSU Awards.[47] Defendants' motion to dismiss Count I under Court of Chancery Rule 12(b)(6) must be denied unless, accepting as true all well-pled allegations of the Complaint and drawing all reasonable inferences from those allegations in Plaintiff's favor, there is no "reasonably conceivable set of

---

[45] In a terse footnote in their brief, Defendants contend that 8 *Del. C.* § 141(h) is "a statutory grant of Business Judgment Rule protection for director compensation decisions" such that, because Plaintiff did not allege with particularity that the Board acted in bad faith or did not exercise its business judgment, demand is not excused. Defs.' Op. Br. 32 n.14. I disagree. Section 141(h) of the Delaware General Corporation Law is a grant of authority for directors to set their compensation, not a statutory safe harbor mandating the business judgment standard of review for director compensation decisions. *See Bosnjak*, 2014 WL 2930869, at *6. Thus, in my view, Section 141(h) does not mean that a director cannot be "interested" in his or her compensation for purposes of Rule 23.1.

[46] *Beam v. Stewart*, 833 A.2d 961, 977 n.48 (Del. Ch. 2003) ("Demand futility analysis is conducted on a claim-by-claim basis."), *aff'd*, 845 A.2d 1040 (Del. 2004).

[47] Compl. ¶ 37.

circumstances susceptible of proof" in which Plaintiff could establish that Defendants breached their fiduciary duties.[48]

## 1. Plaintiff Has Rebutted the Business Judgment Standard

Delaware courts examine the merits of a claim for breach of fiduciary duty through one of (primarily) three doctrinal standards of review: business judgment, enhanced scrutiny, and entire fairness.[49] Where a stockholder cannot rebut the presumptive business judgment standard, the stockholder must show that the board's decision cannot be attributed to any rational business purpose—which, in effect, is the standard for waste under Delaware law.[50] But, where a stockholder rebuts the business judgment standard—for example, by establishing that at least half of the directors who approved a business decision are not independent or disinterested[51]—the Court reviews the directors' decision under the entire fairness standard, in which case the directors must

---

[48] *See Cent. Mortg. Co. v. Morgan Stanley Mortg. Capital Hldgs. LLC*, 27 A.3d 531, 536 (Del. 2011).

[49] *See, e.g.*, *In re Trados Inc. S'holder Litig.*, 73 A.3d 17, 35-36 (Del. Ch. 2013).

[50] *See In re Walt Disney Co. Deriv. Litig.*, 906 A.2d 27, 74 (Del. 2006) ("[The] onerous standard for waste is a corollary of the proposition that where business judgment presumptions are applicable, the board's decision will be upheld unless it cannot be 'attributed to any rational business purpose.' " (quoting *Sinclair Oil Corp. v. Levien*, 280 A.2d 717, 720 (Del. 1971)).

[51] *See Aronson*, 473 A.2d at 812 ("[If] the transaction is not approved by a majority consisting of the disinterested directors, then the business judgment rule has no application[.]"); *see also Lee v. Pincus*, 2014 WL 6066108, at *10, *13 (Del. Ch. Nov. 14, 2014) ("[The plaintiff] has pled facts sufficient to rebut the business judgment standard of review because the [transaction] was not approved by a majority of disinterested and independent directors.").

establish "to the *court's* satisfaction that the transaction was the product of both fair dealing *and* fair price."[52]

The Compensation Committee approved the RSU Awards to the Company's non-employee directors in 2011, 2012, and 2013. These were conflicted decisions because all three members of the Compensation Committee received some of the RSU Awards. As the Delaware Supreme Court observed in *Telxon Corp. v. Meyerson*,[53] director self-compensation decisions are conflicted transactions that "lie outside the business judgment rule's presumptive protection, so that, where properly challenged, the receipt of self-determined benefits is subject to an affirmative showing that the compensation arrangements are fair to the corporation."[54] This is not a case where disinterested directors approved the compensation of other directors;[55] the Compensation Committee

---

[52] *Cede & Co. v. Technicolor, Inc.*, 634 A.2d 345, 361 (Del. 1993).

[53] 802 A.2d 257 (Del. 2002).

[54] *Id.* at 265; *see also Valeant Pharm. Int'l v. Jerney*, 921 A.2d 732, 745 (Del. Ch. 2007) ("Self-interested compensation decisions made without independent protections are subject to the same entire fairness review as any other interested transaction." (citing *Telxon*, 802 A.2d at 265)).

[55] *See, e.g.*, *Cal. Pub. Emps. Ret. Sys. v. Coulter*, 2002 WL 31888343, at *10 n.26 (Del. Ch. Del. 18, 2002) ("It is not alleged that any director approved or participated in the repricing of his own options and was therefore 'interested' as analyzed under the first prong of *Aronson*."); *Tate & Lyle PLC v. Staley Cont'l, Inc.*, 1988 WL 46064 (Del. Ch. May 9, 1988), reprinted at 14 Del. J. Corp. L. 418, 431-32 (Del. Ch. 1988) ("Even when a compensation decision directly benefits directors, if the decision is approved by a committee of disinterested directors, it is afforded the protection of the business judgment rule.").

approved their own compensation and that of the other non-employee directors. Thus, in my view, Plaintiff has rebutted the presumptive business judgment standard of review.

### 2. Stockholder Ratification Concerning Director Compensation

To avoid the entire fairness standard, Defendants raise the affirmative defense of common law stockholder ratification and contend that the RSU Awards must be reviewed under a waste standard. Specifically, Defendants submit that the RSU Awards "were the result of the Board administering the shareholder-approved 2005 [Plan] and were made pursuant to, and in full compliance with, that [P]lan."[56] Plaintiff counters that, even though the RSU Awards were granted under the stockholder-approved Plan, Defendants still bear the burden to establish the entire fairness of the RSU Awards because the Plan "has no meaningful limits" on the total equity compensation that the Company's non-employee directors could hypothetically receive.[57] For this proposition, Plaintiff relies primarily on this Court's decision in *Seinfeld v. Slager*.[58] Defendants challenge *Slager* as "incompatible with the deference owed under settled Delaware law to the fully-informed collective decision of disinterested shareholders to grant directors discretion within broad parameters to exercise business judgment."[59] In support of their position, they present in

---

[56] Defs.' Op. Br. 18.

[57] Pl.'s Ans. Br. 11.

[58] 2012 WL 2501105 (Del. Ch. June 29, 2012).

[59] Defs.' Reply Br. 16.

20

detail "how shareholder approval has been treated for 60 years, both by the Supreme Court and by the Chancery Court."[60]

The question before me is whether advance stockholder approval of a compensation plan with multiple classes of beneficiaries and a single generic limit on the amount of compensation that may be awarded in a given year is sufficient to establish a ratification defense for the RSU Awards that were granted to Citrix's non-employee directors. Given Defendants' contention that sixty years of precedent supports their position, I review those decisions before applying the key principles from them to the allegations here.

The principle of "ratification" stems from the law of agency. As a general matter, as Chancellor Allen explained in *Lewis v. Vogelstein*,[61] ratification

> contemplates the *ex post* conferring upon or confirming of the legal authority of an agent in circumstances in which the agent had no authority or arguably had no authority. . . . [T]he effect of informed ratification is to validate or affirm the act of the agent as the act of the principal.[62]

In the corporate law context, stockholders (as principals) can, by majority vote, retrospectively and, at times, prospectively,[63] act to validate and affirm the acts of the directors (as agents).

---

[60] Tr. of Oral Arg. 37.

[61] 699 A.2d 327 (Del. Ch. 1997).

[62] *Id.* at 334 (citing Restatement (Second) of Agency § 82 (1958)).

[63] Because "[r]atification, in the usual sense, involves shareholders' affirmatively sanctioning earlier board action, the effect of which is to validate that action," the Court has described the notion of "advance ratification"—*i.e.*, board action consistent with

21

The modern doctrine of stockholder ratification under Delaware law in the director compensation context can be traced to three cases decided in 1952 in which stockholders challenged the adequacy of consideration the corporation received in exchange for options awards under stockholder-approved compensation plans. To begin, in *Kerbs v. California Eastern Airways, Inc.*,[64] a stockholder challenged a plan that set forth the specific options "to be granted in designated amounts to named executives of the company."[65] A majority of the directors who approved the plan were conflicted because they also were beneficiaries under the plan, which would typically implicate the entire fairness standard of review. The Supreme Court nevertheless concluded that, because the plan set forth the specific options to be awarded, stockholder approval of the earlier-in-time decision of the board to adopt the plan was a ratification of the consideration and "effective for all purposes unless the action of the directors constituted a gift of corporate assets to themselves or was *ultra vires*, illegal, or fraudulent."[66] Separately, in finding that the record on appeal was insufficient to resolve whether stockholders also had

---

earlier stockholder approval—as "oxymoronic." *In re 3COM Corp. S'holders Litig.*, 1999 WL 1009210, at *3 (Del. Ch. Oct. 25, 1999). Nonetheless, for lack of a better nomenclature and in the interest of simplicity, I use the term "ratification" in this opinion to refer generally to stockholder approval of a specific board action, be it retrospective or prospective.

[64] 90 A.2d 652 (Del. 1952).

[65] *Id.* at 655.

[66] *Id.* at 655 (citing *Keenan v. Eshleman*, 2 A.2d 904 (Del. 1938)). The *Kerbs* Court ultimately enjoined the stock option plan on the grounds of waste "because it [was] not reasonably calculated to insure that the defendant [corporation] will receive the contemplated benefits." *Id.* at 656.

validly ratified a profit-sharing plan approved by similarly conflicted directors, the *Kerbs* Court observed that "the effectiveness of such ratification depends upon the type of notice sent to the stockholders and of the explanation to them of the plan itself."[67]

Simultaneous with deciding *Kerbs*, the Supreme Court issued its first decision in *Gottlieb v. Heyden Chemical Corp.*[68] There, a stockholder challenged a plan that provided "for granting to seven specified officers of the company, six of whom were members of the [nine-member] board of directors, an option to purchase various designated amounts of the common stock of the corporation."[69] The plan also set aside a specified number of shares to be issued as options in amounts and to recipients selected by a board committee. In advance of the their vote on the plan, stockholders

> were furnished the names of the seven officers with whom contracts for options under the plan had already been made, the number of shares allocated to each, the price per share each of said officers was to pay, and the schedule of waiting and working periods specified in all seven contracts[.][70]

As in *Kerbs*, the Supreme Court in *Gottlieb* concluded that informed approval of the plan by the holders of a majority of the corporation's stock ratified the consideration received by the company in exchange for the options issued to the seven specified officers, thereby

---

[67] *Id.* at 659-60.

[68] 90 A.2d 660 (Del. 1952). *Kerbs* and *Gottlieb* were both decided on July 17, 1952, and the subject of further opinions on reargument issued on August 28, 1952, and August 29, 1952, respectively.

[69] *Id.* at 661.

[70] *Id.* at 662.

reducing the standard of review for a challenge to the adequacy of the consideration received by the corporation in exchange for the equity compensation:

> Where there is stockholder ratification, . . . the burden of proof is shifted to the objector. In such a case the objecting stockholder must convince the court that no person of ordinarily sound business judgment would be expected to entertain the view that the consideration furnished by the individual directors is a fair exchange for the options conferred.[71]

Notably, the Supreme Court in *Gottlieb* distinguished between approval of the options specified in the plan that had been awarded, and approval of the number of options set aside to be issued in the future, concluding that there was no ratification of the future options because the stockholders' approval "cannot be taken to have approved specific bargains not yet proposed."[72]

About three months after *Kerbs* and *Gottlieb* had been decided, Chancellor Seitz considered a challenge to the adequacy of the consideration a corporation had received for a restricted stock option plan in *Kaufman v. Shoenberg*.[73]  Importantly, that plan, which did not specify the awards to be issued, was administered exclusively by a committee of directors who were not eligible to receive options under the plan, meaning that the committee's compensation decisions were disinterested.[74]  Although he observed

---

[71] *Gottlieb v. Heyden Chem. Corp.*, 91 A.2d 57, 58 (Del. 1952) (reargument decision). The Supreme Court would affirm this proposition again in *Beard v. Elster*, 160 A.2d 731, 735 (Del. 1960).

[72] *Gottlieb*, 91 A.2d at 60.

[73] 91 A.2d 786 (Del. Ch. 1952).

[74] *Id.* at 789-90.

that the stockholders "did not ratify the issuance of the specific options . . . issued," Chancellor Seitz nonetheless concluded that the facts disclosed in the relevant proxy statement—such as "the mechanics of the [p]lan including the limitations and standards which should govern the [c]ommittee's work"—were sufficient under the circumstances to establish a ratification defense.[75] Accordingly, consistent with *Kerbs* and *Gottlieb*, Chancellor Seitz held that "independent stockholder ratification of interested director action" means that "the objecting stockholder has the burden of showing that no person of ordinary sound business judgment would say that the consideration received for the options was a fair exchange for the options granted."[76]

Drawing on the jurisprudence emanating from *Kerbs*, Chancellor Allen further explained over forty years later the appropriate standard of review for a fiduciary challenge to equity compensation granted to directors under stockholder-approved plans in *Steiner v. Meyerson* and *Lewis v. Vogelstein*.

In *Steiner*, a stockholder attacked Telxon Corporation's outside director stock option plan as a breach of fiduciary duty. That plan granted each non-employee director "an option to purchase 25,000 shares upon election to the Telxon board, and an additional 10,000 shares on the anniversary of his election while he remains on the board."[77] The directors claimed that Telxon's stockholders had ratified the grants made under the plan

---

[75] *Id.* at 793.

[76] *Id.* at 791; *see also Michelson v. Duncan*, 407 A.2d 211, 224 (Del. 1979) (quoting *Kaufman*, 91 A.2d at 791).

[77] *Steiner*, 1995 WL 441999, at *4.

because the plan had been "presented to the Telxon shareholders at the Telxon 1991 annual meeting and approved by a majority of the stockholders."[78]  Chancellor Allen concluded that the upfront stockholder vote in favor of the plan ratified the subsequent awards specified therein.[79]  Critical to the Telxon directors' ratification defense was that the plan was, in effect, self-executing: it set forth the *specific awards* to be granted to the company's non-employee directors upon election to the board and annually thereafter.  In other words, stockholder approval of the plan *per force* meant stockholder approval of the option awards for which the directors asserted a ratification defense.

In *Vogelstein,* a stockholder challenged the grants of options to the directors of Mattel, Inc. made under a stockholder-approved plan providing for two categories of director compensation: (i) one-time grants of 15,000 options per director; and (ii) annual grants of up to 10,000 options per director (depending on length of board service).[80]  Consistent with his analysis in *Steiner*, Chancellor Allen in *Vogelstein* interpreted the *Kerbs* line of cases to stand for the proposition that, where a majority of stockholders vote in favor of (and thereby "ratify") a conflicted board decision, the standard of review becomes functionally one of waste: "shareholder ratification of a transaction in which corporate directors have a material conflict of interest has the effect of protecting the

---

[78] *Id.* at *7.

[79] *See id.* (citing *Kerbs*, 90 A.2d at 655).

[80] *See Vogelstein*, 699 A.2d at 329-30.

transaction from judicial review except on the basis of waste."[81]  Chancellor Allen further

explained that the waste standard for options granted under a stockholder approved plan

had evolved from a "proportionality or reasonableness test a la *Kerbs*," which entailed

examining the adequacy of consideration, to the traditional waste standard referred to in

*Michelson v. Duncan*.[82]

Following *Steiner* and *Vogelstein*, the Court in *In re 3COM Corp. Shareholders*

*Litigation*[83] addressed a stockholder challenge to the "excessive" options granted to the

directors of 3COM Corporation under its stockholder-approved stock option plan for

directors.  Significantly, that plan applied only to directors and set forth "*specific ceilings*

*on the awarding of options each year*," which varied "based on specific categories of

service such as service on a committee, position as a lead director, and chairing the

[b]oard."[84]  Although the 3COM board had the authority to amend these "ceilings," the

board had not changed the award ceilings from those in effect when stockholders

approved the plan.[85]  Rather, the 3COM board issued options to directors in amounts

---

[81] *Id.* at 336 (citing *Gottlieb II*, 91 A.2d at 58).

[82] 407 A.2d 211 (Del. 1979).  *See Vogelstein*, 699 A.2d at 338.  Although the Chancellor assumed in *Vogelstein* "that the ratification was effective," *id.* at 333, he ultimately declined to dismiss the complaint because, as discussed below, he could not rule out that the complaint stated a claim for waste.  *See id.* at 339.

[83] 1999 WL 1009210 (Del. Ch. Oct. 25, 1999).

[84] *Id.* at *3 n.9 (emphasis added).

[85] *See id.* at *1 n.4, *3 n.9 ("The plaintiff does not allege that the [b]oard ever acted outside the set terms of this plan, nor that the [b]oard ever exceeded limitations of the [p]lan.").

*within the specific ceilings* set forth in the plan as approved by 3COM stockholders—a point critical to the Court's analysis.

The *3COM* Court held that, by operation of the initial stockholder approval of the company's director stock option plan and the director-specific ceilings set forth therein, stockholders had effectively approved the subsequent grants at issue in the case:

> The undisputed facts support only one rational conclusion: That valid shareholder action instituted a stock option plan and that the Board's administration of the Plan within its approved limits needed no further stockholder approval. *I do not see this as a case of directors independently or unilaterally granting themselves stock options, but instead a case where stock options accrued to these directors under the terms of an established option plan with sufficiently defined terms.* One cannot plausibly contend that the directors structured and implemented a self-interested transaction inconsistent with the interests of the corporation and its shareholders when *the shareholders knowingly set the parameters of the Plan, approved it in advance, and the directors implemented the Plan according to its terms.* Precedent in this Court clearly establishes that "self-interested" director transactions made under a stock option plan approved by the corporation's shareholders are entitled to the benefit of the business judgment rule.[86]

The rationale of the Court's conclusion in *3COM* is that it would have made little sense to have required the 3COM directors to establish the entire fairness of their compensation when the directors exercised their business judgment to grant options in amounts within the director-specific ceilings previously approved by stockholders. A close parallel of *3COM* can be seen in *Criden v. Steinberg*,[87] where the Court concluded that advance

---

[86] *Id.* at *3 (emphasis added) (citing *Kerbs*, 90 A.2d at 655; *Steiner*, 1995 WL 441999, at *7). Although *3COM* declined to deem this earlier-in-time stockholder vote a "ratification" of the later-in-time board action, *supra* note 63, the Court gave the same standard-reducing effect to the advance stockholder vote as a ratifying stockholder vote.

[87] 2000 WL 354390 (Del. Ch. Mar. 23, 2000).

stockholder approval of a "stock option plan . . . which included [a] re-pricing option" was functionally equivalent, in reducing the standard of review to waste, to stockholder approval of the subsequent option re-pricings at issue in that case "because the shareholders knowingly endorsed the parameters of the plan."[88]

Building on the *Kerbs*, *Steiner*, and *3COM* line of cases, then-Vice Chancellor Strine's analysis in *Sample v. Morgan*[89] provides important guidance on the scope of stockholder ratification for director compensation. The plaintiff in *Sample* alleged that the five members of the board of Randall Bearings, Inc. breached their fiduciary duties when the two non-employee directors on the compensation committee awarded 200,000 shares to the company's three employee directors under a management stock incentive plan. A disinterested majority of Randall Bearings's stockholders had previously approved the plan, which authorized up to 200,000 shares. But, the plan did not set forth the specific amounts of stock to be issued to directors, and stockholders did not specifically approve any shares granted to directors under the plan.[90]

The plaintiff asserted that the defendants bore the burden to establish the entire fairness of those awards as conflicted transactions. In opposition, the defendants asserted a ratification defense. Specifically, similar to Defendants here, they argued that the fact

---

[88] *Id.* at *3 ("The board of directors acted according to a predetermined stock option plan, approved by the shareholders, which included the re-pricing option. The plaintiff raises no issue that the board lacked authority to re-price the options or that they implemented the re-pricing in a manner unintended or unexpected by the shareholders.").

[89] 914 A.2d 647 (Del. Ch. 2007).

[90] *See id.* at 655-57.

that disinterested stockholders had approved the plan meant that stockholders had functionally "ratif[ied] any future action by the board" permitted under the plan, which would include awarding all 200,000 shares to a majority of the board.[91] In other words, the *Sample* directors argued that upfront stockholder approval of the general terms of an equity compensation plan—even though the plan did not include any director-specific limits on compensation—was a "ratification" of the subsequent grants made under that plan.

Then-Vice Chancellor Strine squarely rejected this argument. In doing so, he outlined the contours of stockholder ratification as follows:

> *[T]he Delaware doctrine of ratification does not embrace a "blank check" theory.* When uncoerced, fully informed, and disinterested stockholders approve a *specific* corporate action, the doctrine of ratification, in most situations, precludes claims for breach of fiduciary duty attacking that action. But *the mere approval by stockholders of a request by directors for the authority to take action within broad parameters does not insulate all future action by the directors within those parameters from attack.* Although the fact of stockholder approval might have some bearing on consideration of a fiduciary duty claim in that context, it does not, by itself, preclude such a claim. An essential aspect of our form of corporate law is the balance between law (in the form of statute and contract, including the contracts governing the internal affairs of corporations, such as charters and bylaws) and equity (in the form of concepts of fiduciary duty). Stockholders can entrust directors with broad legal authority precisely because they know that that authority must be exercised consistently with equitable principles of fiduciary duty. Therefore, the entrustment to the [corporation's compensation committee] of the authority to issue up to 200,000 shares to key employees under discretionary terms and conditions cannot reasonably be interpreted as a license for the [c]ommittee and other directors making proposals to it to do whatever they wished, unconstrained

---

[91] *See id.* at 663 ("By approving . . . the Incentive Plan, the Randall Bearings stockholders were, the directors contend, ratifying any future action by the board, however motivated or informed, so long as that action was compliant with the literal terms of . . . the Plan.").

by equity. Rather, it is best understood as a decision by the stockholders to give the directors broad legal authority and to rely upon the policing of equity to ensure that that authority would be utilized properly. For this reason alone, the directors' ratification argument fails.[92]

The key point I take away from this analysis is that because the stockholders in *Sample* merely voted in favor of the broad parameters of the plan—and had not voted in favor of any specific awards under the plan—the defendants could not show that stockholders had ratified the decision to grant all of the 200,000 shares authorized under the plan to just the three employee directors. Thus, the directors' conduct would be reviewed under ordinary principles of fiduciary duty and not limited to a waste standard.[93]

The case most analogous to the facts alleged here is *Seinfeld v. Slager*, which Plaintiff cites as its primary authority. In *Slager*, a stockholder challenged the fairness of RSU awards that the non-employee directors of Republic Services, Inc. received under the company's stockholder-approved compensation plan. Those directors received RSUs worth $743,700 in 2009 and $215,000 in 2010. Unlike the plans in *Telxon* and *3COM*, the only beneficiaries of which were directors, the beneficiaries under the Republic Services plan (like the Plan in this case) included the company's directors, officers, and employees. Critically, the plan approved by stockholders in *Slager* (like the Plan in this case) did not set forth any specific amounts (or director-specific ceilings) of

---

[92] *Id.* at 663-64 (emphasis added). The Court went on to hold separately that there was no ratification because the defendants did not establish that the initial stockholder vote in favor of the plan was fully informed. *Id.* at 665-67.

[93] *See id.* ("Each director's motivations and actions must be assessed individually before any finding of liability [for breach of fiduciary duty] can be made."). The Court further held it could not "rule out waste." *Id.* at 670.

31

compensation that would or could be awarded to directors. Instead, the plan featured a generic limit on the compensation that any one beneficiary could receive per fiscal year. For RSUs, the generic limit was up to 1.25 million units.[94] Given that Republic Services's plan authorized up to 10.5 million shares, and that the company's board had twelve members, the *Slager* Court observed that each of those twelve directors could have received 875,000 RSUs as compensation in one year—which, as of the 2009 awards, would have been worth roughly $21.7 million per recipient.[95]

The *Slager* defendants argued that upfront stockholder approval of the plan ratified the subsequent RSU grants, but the Court rejected this ratification defense. In doing so, the Court emphasized that the plan had "no effective limits on the total amount of pay that can be awarded through time-vesting restricted stock units," meaning that, under the plan, Republic Services directors had "the theoretical ability to award themselves as much as tens of millions of dollars per year, with few limitations."[96] Although *Slager* does not reference the analysis in *Sample* discussed above, the logic and reasoning of the cases are aligned. Just as *Sample* rejected a "blank check" theory of ratification, so did *Slager* reject a "*carte blanche*" theory:

> The Stock Plan lacks sufficient definition to afford the Defendant Directors protection under the business judgment rule. The sufficiency of definition that anoints a stockholder-approved option or bonus plan with business judgment rule protection exists on a continuum. Though the stockholders

---

[94] *See Slager*, 2012 WL 2501105, at *10.

[95] *See id.* at *11.

[96] *Id.* at *12.

approved this plan, there must be some meaningful limit imposed by the stockholders on the Board for the plan to be consecrated by *3COM* and receive the blessing of the business judgment rule, else the "sufficiently defined terms" language of *3COM* is rendered toothless. *A stockholder-approved* carte blanche *to the directors is insufficient.* The more definite a plan, the more likely that a board's compensation decision will be labeled disinterested and qualify for protection under the business judgment rule. *If a board is free to use its absolute discretion under even a stockholder-approved plan, with little guidance as to the total pay that can be awarded, a board will ultimately have to show that the transaction is entirely fair.*[97]

Accordingly, as I read the case, because the Republic Services stockholders had not voted in favor of the specific RSU grants at issue or to impose a limit applicable (or "meaningful") to directors specifically—as opposed to a generic limit applicable to a range of beneficiaries with differing roles—there was no ratification defense.[98]

Finally, last year, in *Cambridge Retirement System v. Bosnjak*, I considered a stockholder ratification defense concerning director compensation. In that case, a stockholder alleged that the directors of Unilife Corporation breached their fiduciary duties by awarding to themselves excessive option grants under the company's stock incentive plan. It was undisputed in that case, however, that the Unilife directors "*conditioned* [their] grant of each of the challenged equity awards on obtaining stockholder approval, *which the stockholders provided*."[99] That is, although the Unilife plan did not set forth the specific compensation that directors would receive, the

---

[97] *Id.* at \*12 (emphasis added).

[98] *Id.* ("While the Defendant Directors may be able to show that the amounts they awarded themselves are entirely fair, their motion to dismiss must be denied with respect to this claim.").

[99] *Bosnjak*, 2014 WL 2930869 at \*2 (emphasis added).

stockholders voted in favor of the specific awards. Citing the principles set forth in *Kerbs*, *Steiner*, and *3COM*, I credited the directors' ratification defense because "Unilife's stockholders *approved each of the specific equity awards* challenged."[100]

*   *   *

In my view, this case law discussed above supports two principles of common law stockholder ratification relevant to director compensation.

One principle is that the affirmative defense of ratification is available only where a majority of informed, uncoerced, and disinterested stockholders[101] vote in favor of a *specific decision* of the board of directors. Indeed, this is the standard about the scope of ratification pronounced by the Delaware Supreme Court in *Gantler v. Stephens*.[102] There, the defendants argued that stockholders had ratified the directors' purportedly interested

---

[100] *Id.* at *8 (emphasis added). Contrary to Defendants' interpretation, I do not find *In re Ebix, Inc. Stockholder Litigation*, 2014 WL 3696655 (Del. Ch. July 24, 2014), to be in tension with the law cited above. In *Ebix*, stockholders challenged the disclosures in a proxy statement in which stockholders were asked to approve a compensation plan for directors, officers, and employees. In a passing comment, the Court surmised that, "were the Ebix stockholder approval (and thus ratification) of the 2010 Plan valid[,] . . . then the grants of options . . . under the 2010 Plan would be analyzed under the deferential business judgment standard of review." *Ebix*, 2014 WL 3696655, at *26. In my view, this statement (which Defendants themselves describe as dicta) is not a binding precedent because the Court did not consider the absence of any director-specific limits on compensation in the plan. *See In re MFW S'holders Litig.*, 67 A.3d 496, 521 (Del. Ch. 2013) ("If an issue is not presented to a court with the benefit of full argument and record, any statement on that issue by that court is not a holding with binding force."), *aff'd sub nom. Kahn v. M & F Worldwide Corp.*, 88 A.3d 635 (Del. 2014).

[101] *See Vogelstein*, 699 A.2d at 336; *see also Harbor Fin. P'rs v. Huizenga*, 751 A.2d 879, 899 (Del. Ch. 1999) ("The burden to prove that the [stockholder ratification] vote was fair, uncoerced, and fully informed falls squarely on the board.").

[102] 965 A.2d 695 (Del. 2009).

decision to recommend that stockholders approve a stock reclassification proposal. Although *Gantler* ultimately rejected the ratification defense because the complaint adequately alleged that the stockholder vote was not fully informed, the Supreme Court held, as a matter of law, that "the only director action or conduct that can be ratified is *that which the shareholders are specifically asked to approve*."[103]  As support for this proposition, *Gantler* cites to *In re Santa Fe Pacific Corp. Shareholder Litigation*,[104] where the Supreme Court earlier had concluded that a stockholder vote in favor of a merger did not ratify the board's approval of any deal protection provisions in the merger agreement because, in that case, the stockholders did not "*specifically vote in favor*" of those defensive measures.[105]

The primary authorities the parties have cited all reflect this standard.  There was valid stockholder ratification of the compensation awarded to directors in *Kerbs*, *Gottlieb*, *Steiner*, and *Vogelstein* because the plans in those cases set forth the specific compensation to be received by directors.  There also was valid stockholder approval of

---

[103] *Id.* at 713 (emphasis added).

[104] 669 A.2d 59 (Del. 1995).

[105] *Id.* at 68 (emphasis added).  Additional support for this proposition can be found in decisions of this Court issued between *Santa Fe* and *Gantler*.  *See, e.g.*, *In re Lukens Inc. S'holders Litig.*, 757 A.2d 720, 737 (Del. Ch. 1999) ("Unlike the situation in *Santa Fe*, the proposition voted on by the Lukens stockholders fairly framed the question whether or not to ratify the job done by the Lukens directors in managing the bidding process."), *aff'd sub nom. Walker v. Lukens, Inc.*, 757 A.2d 1278 (Del. 2000) (TABLE); *Solomon v. Armstrong*, 747 A.2d 1098, 1113-14 (Del. Ch. 1999) ("[T]he Delaware Supreme Court has made it clear that ratification of one board action does *not* extend to any other actions which are not necessarily attendant to that approved action."), *aff'd*, 746 A.2d 277 (Del. 2000) (TABLE).

the compensation awarded to directors in *3COM* and *Criden* because the awards at issue were within the director-specific ceilings of *3COM* and within the repricing parameters of *Criden*.[106] Finally, there was valid stockholder ratification in *Bosnjak* because, separate from the upfront vote in favor of the plan, stockholders specifically approved the awards at issue in that case. Conversely, there was no stockholder ratification of the compensation that was the subject of *Sample* and *Slager* because those stockholders had merely voted in favor of the broad parameters of plans that did not set any specific limits on the compensation of the particular class of beneficiaries in question.

The second principle is well-established and non-controversial: valid stockholder ratification leads to waste being the doctrinal standard of review for a breach of fiduciary duty claim.[107] Approval by a mere majority of stockholders does not ratify waste because

---

[106] With respect to the *Steiner* and *3COM* cases, Defendants argue that the Telxon and 3COM directors had the authority under their respective plans to amend the terms of those plans, meaning that, to establish ratification here, Defendants need only show that Citrix stockholders approved the Plan in 2005. Defs.' Reply Br. 11-13. I disagree. In my opinion, the fact that the Telxon or 3COM boards had such authority was immaterial to the analysis in *Steiner* and *3COM* because in neither case was it alleged that the board had actually exercised that authority.

[107] *See, e.g.*, *Michelson*, 407 A.2d at 219, 224; *Vogelstein*, 699 A.2d at 336; *see generally* J. Travis Laster, *The Effect of Stockholder Approval on Enhanced Scrutiny*, 40 Wm. Mitchell L. Rev. 1443, 1486 n.213 (2014) ("[T]he practical effect of restoring business judgment review [where there has been stockholder ratification] is to change the standard of review to one of waste."); William T. Allen, Jack B. Jacobs & Leo E. Strine, Jr., *Function over Form: A Reassessment of Standards of Review in Delaware Corporation Law*, 56 Bus. Law. 1287, 1317-18 (2001) ("Under present Delaware law, a fully informed majority vote *of the disinterested stockholders* that approves a transaction (other than a merger with a controlling stockholder) has the effect of insulating the directors from all claims except waste.").

"a waste of corporate assets is incapable of ratification without unanimous stockholder consent."[108]

Important policy considerations support these two principles of common law stockholder ratification in the context of director compensation. Specifying the precise amount and form of director compensation in an equity compensation plan when it is submitted for stockholder approval "ensure[s] integrity" in the underlying principal-agent relationship between stockholders and directors "by making the directors suffer the ugly and enjoy the good that comes with a consistent, non-discretionary approach" to their compensation.[109] Likewise, obtaining stockholder approval of director compensation on an annual or regular basis facilitates the disclosure of inherently conflicted decisions and empowers stockholders with a meaningful role in the compensation of their fiduciaries.[110]

### 3. Citrix's Stockholders Did Not Ratify the RSU Awards

Turning to the present case, Citrix stockholders initially approved the Plan in 2005. Because Plaintiff does not allege otherwise, I treat the Citrix stockholder approval of the Plan in 2005 (and of the amendments thereto) as a vote of approval by a majority of informed, uncoerced, and disinterested stockholders.

---

[108] *Saxe v. Brady*, 184 A.2d 602, 605 (Del. Ch. 1962); *Vogelstein*, 699 A.2d at 335-36 ("[N]o one should be forced against their will to make a gift of their property.").

[109] *See Desimone*, 924 A.2d at 917.

[110] " 'Sunlight is said to be the best of disinfectants; electric light the most effective policeman.' " *Buckley v. Am Constitutional Law Found.*, 525 U.S. 182, 223 (1999) (O'Connor, J., concurring in part and dissenting in part) (quoting Louis D. Brandeis, OTHER PEOPLE'S MONEY 62 (1933)).

The Plan specified the total shares available (Section 4), the beneficiaries under the Plan (Section 6.1(a)), and the total number of shares that any beneficiary could receive in a calendar year (Section 6.1(b)). But the Plan did not specify the amount or form of compensation to be issued to the Company's non-employee directors. Rather, the only limit on director compensation appears in Section 6.1(b): directors, like every other eligible recipient under the Plan, may receive up to 1 million shares (or equivalent RSU awards) per calendar year. To repeat, based on Citrix's stock price at the time, one million RSUs were worth over $55 million when this action was filed.

In my view, Defendants have not carried their burden to establish a ratification affirmative defense at this procedural stage because Citrix stockholders were never asked to approve—and thus did not approve—any *action bearing specifically on the magnitude of compensation for the Company's non-employee directors*. Unlike in *Steiner* or *Vogelstein*, the Plan here does not set forth the specific compensation to be granted to non-employee directors. And, unlike in *3COM*, the Plan here does not set forth any director-specific "ceilings" on the compensation that could be granted to the Company's directors.

I see no meaningful difference between the allegations here and those in *Slager,* which I do not read (for the reasons discussed above) as a departure from Delaware precedent as Defendants have argued. Here, as in *Slager*, the Plan does not specify any amounts (or director-specific ceilings) of equity compensation that Citrix directors would or could receive independent of the generic annual limit applicable to all the varied classes of beneficiaries under the Plan. Under *Sample* and *Slager*, the upfront

38

stockholder approval of the Plan was not a "blank check" or *"carte blanche"* ratification of any compensation that the Compensation Committee might award to the Company's non-employee directors. Thus, in my opinion, upfront stockholder approval by Citrix stockholders of the Plan's generic limits on compensation for all beneficiaries under the Plan does not establish a ratification defense for the RSU Awards because, when the Board sought stockholder approval of the broad parameters of the Plan and the generic limits specified therein, Citrix stockholders were not asked to approve any *action specific to director compensation*. They were simply asked to approve, in very broad terms, the Plan itself. For this reason, as in *Sample* and *Slager*, I cannot conclude that the Company's stockholders ratified the RSU Awards such that those awards would be limited to challenge under a waste standard.

At the Company's annual meetings in 2012 and 2013, Citrix stockholders voted in favor of amendments to the Plan to increase the total number of shares available under the Plan and to "ratif[y], confirm[] and approve[]" the Plan in all respects.[111] But, in those proxy statements, Citrix stockholders were not specifically asked to ratify the RSU Awards granted the prior year.[112] Nonetheless, Defendants argue that because the

---

[111] *See* Letter from Thomas A. Beck, at 1, Ex. 3 (Jan. 16, 2015); *see also* Defs.' Ex. O at 17 (Citrix Systems, Inc. Proxy Statement (Schedule 14A), at Exhibit A (Apr. 13, 2012)), Defs.' Ex. P at 18 (Citrix Systems, Inc. Proxy Statement (Schedule 14A), at Exhibit A (Apr. 12, 2013)). As I understand it, the Board did not seek stockholder approval to increase the total number of shares under the Plan or to "ratify, confirm, and approve" the Plan at the Company's annual meeting in 2014 because the Board sought stockholder approval of a new 2014 Equity Incentive Plan. *See* Compl. ¶¶ 25-26; Defs.' Ex. Q at 13-21 (Citrix Systems, Inc. Proxy Statement (Schedule 14A), at 54-62 (Apr. 11, 2014)).

[112] Tr. of Oral Arg. 7.

relevant proxy statements disclosed the specific compensation that was granted to non-employee members of the Board during the prior years (*i.e.*, the RSU Awards issued in 2011 and 2012),[113] the vote to "ratify, confirm, and approve" the Plan was the functional equivalent of a vote in favor of the RSU Awards. I disagree. Unlike in *Bosnjak*, the Company's proxy statements in 2012 and 2013 did not seek stockholder approval of the specific compensation that had been (or that would be) awarded to the non-employee members of the Board. Instead, the Citrix stockholder approval of the Plan in 2012 and 2013 ratified only the adoption and terms of the Plan.

For these reasons, I conclude that Defendants have not carried their burden to show that the Company's stockholders ratified the RSU Awards.[114] Accordingly, the operative standard of review remains entire fairness with the burden on Defendants.

### 4. It is Reasonably Conceivable that the RSU Awards were Not Entirely Fair

Where, as here, the entire fairness standard of review applies, Defendants must establish that the decision "was the product of both fair dealing *and* fair price."[115] The fact that the entire fairness standard applies "normally will preclude dismissal of a

---

[113] *See* Defs.' Ex. O at 8; Defs.' Ex. P at 9.

[114] I thus do not reach the legal issues related to abstentions and broker "non-votes" discussed in the parties' supplemental briefing.

[115] *Technicolor*, 634 A.2d at 361; *see also Weinberger v. UOP, Inc.*, 457 A.2d 701, 710 (Del. 1983) ("[A]ll aspects of the issue must be examined as a whole since the question is one of entire fairness.").

40

complaint on a Rule 12(b)(6) motion to dismiss."[116] But, "[e]ven in a self-interested transaction in order to state a claim a shareholder must allege some facts that tend to show that the transaction was not fair."[117]

The parties frame the issue of whether the RSU Awards were entirely fair as a matter of whether Citrix's non-employee director compensation practices were in line with those of the Company's "peer" group. Defendants argue that Citrix's peer group for director compensation purposes is the fourteen companies identified by the Company as its peers in its filings with the Securities and Exchange Commission.[118] Plaintiff, on the other hand, submits that the appropriate peer group should be limited to only five of the Company's fourteen self-selected peers based on comparable market capitalization, revenue, and net income metrics.[119]

In my view, Plaintiff has raised meaningful questions as to whether certain companies with considerably higher market capitalizations, revenue, and net income— such as Amazon.com, Google, and Microsoft—should be included in the peer group used

---

[116] *Orman v. Cullman*, 794 A.2d 5, 20 n.36 (Del. Ch. 2002).

[117] *Solomon v. Pathe Commc'ns Corp.*, 1995 WL 250374, at *5 (Del. Ch. Apr. 21, 1995), *aff'd*, 672 A.2d 35 (Del. 1996).

[118] Defs.' Op. Br. 16-17. Defendants' peer group includes Adobe Systems Inc.; Akamai Technologies, Inc.; Amazon.com, Inc.; Cisco Systems, Inc.; Concur Technologies, Inc.; F5 Networks, Inc.; Google Inc.; Intuit Inc.; Juniper Networks, Inc.; LinkedIn Corp.; Microsoft Corp.; Rackspace Hosting, Inc.; Red Hat, Inc.; Riverbed Technology, Inc.; SalesForce.com, Inc.; and VMware, Inc.

[119] Compl. ¶ 1 n.1. Plaintiff's peer group includes Akamai Technologies, Inc.; F5 Networks, Inc.; Juniper Networks, Inc.; Rackspace Hosting, Inc.; and Red Hat, Inc.

41

to determine the fair value of compensation for Citrix's non-employee directors. These factual questions about the fairness of the RSU Awards in comparison to the director compensation practices at public companies that are comparable to Citrix, however, cannot be resolved at the procedural stage of the present Rule 12(b)(6) motion. Thus, Count I states a claim for breach of fiduciary duty.

### C.    Count II Fails to State a Claim for Waste

In Count II, Plaintiff alleges that the Company "wasted its valuable assets by paying . . . Defendants excessive compensation" in the form of the RSU Awards.[120] He contends that the RSU Awards, particularly those granted in 2011, were "sufficiently large or unusual compensation" to state a claim for waste.[121] Defendants counter that Plaintiff's allegations "do not remotely support the inference that Citrix's non-employee director compensation was so one-sided that no reasonable business person could conclude that the Company received adequate consideration."[122]    I agree with Defendants.

As then-Vice Chancellor Strine explained in *Sample*, "the doctrine of waste is a residual protection for stockholders that polices the outer boundaries of the broad field of discretion afforded directors by the business judgment rule."[123]   Under Delaware law,

---

[120] *Id.* ¶ 41.

[121] Pl.'s Ans. Br. 19.

[122] Defs.' Op. Br. 28.

[123] *Sample*, 914 A.2d at 669.

42

directors waste corporate assets when they approve a decision that cannot be attributed to "any rational business purpose."[124] To state a claim for waste, it must be reasonably conceivable that the directors "authorize[d] an exchange that [was] so one sided that no business person of ordinary, sound judgment could conclude that the corporation has received adequate consideration,"[125] *i.e.*, the transfer of corporate assets was a "gift."[126]

Plaintiff's core argument is that the facts alleged in the Complaint, at least with respect to the RSU Awards granted in 2011, are analogous to those found to state a claim for waste in *Vogelstein*. I disagree. In *Vogelstein*, a stockholder challenged the compensation plan of Mattel, Inc. providing for annual grants to directors of up to 10,000 options (depending on the length of board service) and a one-time grant to directors of 15,000 options. The one-time options were exercisable immediately at the market price on the day of grant and would remain valid for ten years, and the present value of the one-time options was alleged to be as much as $180,000 per director.[127] Given the size and terms of the one-time grants compared to the annual grants, Chancellor Allen concluded that the plaintiff stated a claim for waste:

> I cannot conclude that no set of facts could be shown that would permit the court to conclude that the grant of these options, particularly focusing upon the one-time options, constituted an exchange to which no reasonable person not acting under compulsion and in good faith could agree. In so

---

[124] *See Sinclair Oil*, 280 A.2d at 720.

[125] *Glazer v. Zapata Corp.*, 658 A.2d 176, 183 (Del. Ch. 1993).

[126] *Vogelstein*, 699 A.2d at 336.

[127] *See id.* at 329, 330 n.2.

43

concluding, I do not mean to suggest a view that these grants are suspect, only that one time option grants to directors of this size seem at this point sufficiently unusual to require the court to refer to evidence before making an adjudication of their validity and consistency with fiduciary duty.[128]

The facts alleged in *Vogelstein* are readily distinguishable from the conclusory allegations of waste in the Complaint. The primary options at issue in *Vogelstein* were the one-time grants, which were on top of—and as much as three times the size of—the annual grants. On that basis, it was reasonable to infer that the one-time option grants were a gift for which Mattel received no consideration. Here, by contrast, the RSU Awards were not in addition to any annual equity grants—they *were* the annual equity grants to Citrix's non-employee directors and the primary compensation for those directors for their service on the Board. The fact that the RSUs issued to the non-employee directors in 2011 had a higher grant date fair value than the RSUs and stock options issued to those individuals in 2010 does not show a complete failure of consideration, nor does the fact that the total compensation received by Citrix's non-employee directors in 2011-2013 may have been higher than that received by directors at certain of the Company's peers.

Although Plaintiff has stated a claim that the RSU Awards were not entirely fair to the Company in comparison to the compensation received by directors at Citrix's peer group, the Complaint does not plead in my view the rare type of facts from which it is reasonably conceivable that the RSU Awards are so far beyond the bounds of what a

---

[128] *Id.* at 339.

44

person of sound, ordinary business judgment would conclude is adequate consideration to the Company.[129] Count II thus fails to state a claim.

### D.    Count III States a Claim for Unjust Enrichment

In Count III, Plaintiff contends that Defendants "were unjustly compensated by engaging in the self-interested approval of RSUs well in excess of peer companies."[130]

Broadly speaking, unjust enrichment is "the unjust retention of a benefit to the loss of another."[131]    A claim for unjust enrichment under Delaware law includes five elements: "(1) an enrichment, (2) an impoverishment, (3) a relation between the enrichment and impoverishment, (4) the absence of justification, and (5) the absence of a remedy provided by law."[132]    At the pleadings stage, an unjust enrichment claim that is entirely duplicative of a breach of fiduciary duty claim—*i.e.*, where both claims are premised on the same purported breach of fiduciary duty—is frequently treated "in the same manner when resolving a motion to dismiss."[133]

---

[129] *3COM*, 1999 WL 1009210, at *5 ("Bare allegations that the alleged [compensation grants to directors] are excessive or even lavish, as pleaded here, are insufficient as a matter of law to meet the standard required for a claim of waste.").

[130] Pl.'s Ans. Br. 21; *see also* Compl. ¶ 45 ("Defendants were unjustly enriched as a result of the compensation and director remuneration they received while breaching fiduciary duties owed to Citrix.").

[131] *Fleer Corp. v. Topps Chewing Gum, Inc.*, 539 A.2d 1060, 1062 (Del. 1988).

[132] *Nemec v. Shrader*, 991 A.2d 1120, 1130 (Del. 2010).

[133] *Frank v. Elgamal*, 2014 WL 957550, at *31 (Del. Ch. Mar. 10, 2014); *see also Dubroff v. Wren Hldgs., LLC*, 2011 WL 5137175, at *11 (Del. Ch. Oct. 28, 2011) (denying a motion to dismiss a fiduciary duty claim and a duplicative unjust enrichment claim); *Monroe Cnty. Emps.' Ret. Sys. v. Carlson*, 2010 WL 2376890, at *1 (Del. Ch.

I view Count III as duplicative of Count I because there is no alleged unjust enrichment separate or distinct from the alleged breach of fiduciary duty: if Defendants did not breach their fiduciary duties in receiving the RSU Awards, then Defendants could not have been unjustly enriched by retaining the RSU Awards. Indeed, Defendants' sole argument on why Count III should be dismissed is that the alleged unjust enrichment is premised on the same insufficient allegations of a breach of fiduciary duty.[134] Nevertheless, because I concluded above that Count I states a claim for breach of fiduciary duty, I also conclude that it is reasonably conceivable that Plaintiff could recover under Count III. Defendants' motion to dismiss Count III is thus denied.[135]

## IV. CONCLUSION

For the foregoing reasons, Defendants' motion to dismiss the Complaint under Court of Chancery Rule 23.1 is DENIED. Defendants' motion to dismiss the Complaint under Court of Chancery Rule 12(b)(6) is GRANTED as to Count II, GRANTED as to Counts I and III against Defendant Templeton,[136] and DENIED as to Counts I and III against the other Defendants.

**IT IS SO ORDERED**.

---

June 7, 2010) (granting a motion to dismiss a fiduciary duty claim and a duplicative unjust enrichment claim).

[134] Defs.' Reply Br. 33; Defs.' Op. Br. 28-29.

[135] Plaintiff, of course, may only recover on either Count I or Count III at trial. *See MCG Capital Corp. v. Maginn*, 2010 WL 1782271, at *25 n.147 (Del. Ch. May 5, 2010).

[136] Because Templeton, Citrix's CEO, is not alleged to have approved or received any of the RSU Awards, Plaintiff has not alleged a basis to infer that Templeton breached his fiduciary duties or was unjustly enriched.